IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 97-21003

———————————

DAVID R. RUIZ; ET AL.,

Plaintiffs-Appellees,

UNITED STATES OF AMERICA,

Intervenor Plaintiff-Appellee,

versus

W.J. ESTELLE; TEXAS BOARD OF CORRECTIONS,

Defendants-Appellees,

versus

REPRESENTATIVE JOHN CULBERSON; SENATOR J.E. BROWN,

Movants-Appellants.

———————————

Appeals from the United States District Court for the
Southern District of Texas

———————————

November 20, 1998

Before KING, GARWOOD and HIGGINBOTHAM, Circuit Judges.

GARWOOD, Circuit Judge:

This case involves the attempt by appellants, two Texas state legislators, to intervene in the long pending suit concerning Texas prison conditions, which began more than twenty-five years ago. The district court denied appellants' motion to intervene under

Fed. R. Civ. P., Rules 24(a)(1), 24(a)(2), and 24(b)(2).[1] Because we conclude that 18 U.S.C. § 3626(a)(3)(F) grants the appellants "an unconditional right to intervene" in this case within the meaning of Rule 24(a)(1), we reverse.

In 1972, class-action plaintiffs David Ruiz, et. al. (plaintiffs), initiated litigation against the Texas prison authorities, now the Texas Department of Criminal Justice-Institutional Division (TDCJ), for constitutional violations in Texas prisons. *See generally Ruiz v. Estelle,* 503 F.Supp. 1265 (S.D. Tex. 1980), *rev'd in part*, 679 F.2d 1115 (5th Cir. 1992), *modified in part*, 688 F.2d 266 (5th Cir. 1982), *cert. denied*, 103 S.Ct. 1438 (1983). After a lengthy trial, the district court ordered injunctive relief, and this Court largely affirmed. *See id.* Thereafter, the district court assumed a supervisory role over Texas prison conditions. *See Ruiz v. Lynaugh*, 811 F.2d 856 (5th Cir. 1987).

---

[1] "**Rule 24. Intervention.**
**(a) Intervention of Right**. Upon timely application, anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the application claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
**(b) Permissive Intervention.** Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the Untied States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a common question of law or fact . . . ."

2

In 1990, the district court ordered the parties to begin negotiations to bring about a comprehensive final order in the case, including timetables for termination of the court's jurisdiction. *See Ruiz v. Collins*, Civil No. H-78-987-CA (S.D. Tex. Dec. 11, 1992) (Memorandum Opinion Accompanying Order Approving Final Judgment). After notice and evidentiary hearing, the district court entered the parties' agreed Final Judgment in December 1992, which terminated the district court's jurisdiction in all but eight substantive areas. One of these eight areas was prison population and crowding conditions.

In March 1996, the TDCJ moved to terminate the Final Judgment, and accordingly end the district court's supervision over Texas prisons. On April 26, 1996, the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626, Pub. L. 104-134, Title VIII, Sec. 802(a), 110 Stat. 1321-66, was signed into law by President Clinton. On May 21, 1996, appellants filed a motion to intervene in the district court, and a proposed motion to vacate the December 1992 Final Judgment, pursuant to the PLRA. In June 1996, plaintiffs filed an opposition to TDCJ's motion to terminate, and plaintiffs and TDCJ filed their respective oppositions to appellants' motion to intervene. On September 6, 1996, TDCJ filed a supplemental motion to vacate the December 1992 judgment and terminate the district court's jurisdiction under the PLRA; later that month plaintiffs filed an opposition to the motion. As of the time this case was orally argued before us in October 1998, TDCJ's motion to terminate was still pending and had not been ruled on. On August

3

29, 1997, appellants filed a motion for expedited ruling on their motion to intervene and on their therewith tendered motion to terminate.  By order signed November 21 and entered November 24, 1997, the district court denied appellants' motion to intervene.  On November 26, 1997, President Clinton signed into law amendments to the PLRA.  Pub.L. 105-119, § 123(a), 111 Stat. 2470.  On December 4, 1997, appellants filed their motion to reconsider the district court's November 24, 1997, order denying their motion to intervene, raising, *inter alia*, the November 1997 amendments to the PLRA.  Plaintiffs and TDCJ opposed the motion.  Also on December 4, appellants filed a protective notice of appeal from the November 24 order.  On January 28, 1998, the district court denied appellants' motion for reconsideration, and on January 29, 1998, appellants filed an amended notice of appeal as to both the November 24 and the January 28 orders.

The PLRA narrowly limits the relief which a federal court may order in prisoner suits.  *See* section 3626.  It prohibits a federal court from ordering any prospective relief "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary . . . ."  *See* section 3626(a)(1)(A).  Moreover, the PLRA authorizes the termination of existing prospective relief that does not comply with these limits. *See* section 3626(b)(2).[2]  *See also Plyler v. Moore*, 100 F.3d 365,

---

[2]      Section 802(b)(i) of Pub. L. 104-134, 110 Stat. 1321-70, provides:

4

369 (4th Cir. 1996) ("The PLRA also provides an avenue for states to end their obligations under consent decrees providing for greater prospective relief than that required by federal law."). The PLRA grants certain governmental officials the right to intervene in relevant litigation.[3] This intervention provision forms the basis of the present appeal.

## I. Whether the PLRA Applies

Appellants, Texas State Senator J.E. "Buster" Brown and Texas State Representative John Culberson (appellants or 'Brown and Culberson'), seek to intervene in the termination action brought by TDCJ.[4] TDCJ, Brown, and Culberson seek the very same ultimate

---

"Section 3626 of title 18, United States Code, as amended by this section, shall apply with respect to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title."

[3] The PLRA as amended in November 1997 states, in pertinent part:

"Any State or local official including a legislator or unit of government whose jurisdiction or function includes the appropriation of funds for the construction, operation, or maintenance of prison facilities, or the prosecution or custody of persons who may be released from, or not admitted to, a prison as a result of a prisoner release order shall have standing to oppose the imposition or continuation in effect of such relief and to seek termination of such relief, and shall have the right to intervene in any proceeding relating to such relief." Section 3626(a)(3)(F)

The legislation affecting the November 1997 PLRA amendments provides that "The amendments made by this Act shall take effect upon the date of the enactment of this Act and shall apply to pending cases." Pub.L. 105-119, § 123(b), 111 Stat. 2471.

[4] Both TDCJ and plaintiffs oppose the intervention. They are sometimes herein referred to collectively as appellees.

5

relief, namely termination of the Final Judgment. However, appellants contend that TDCJ is not adequately pursuing this goal. Specifically, Brown and Culberson object to the TDCJ's claimed failure to assert alternative arguments for termination of the Final Judgment, including arguments under the Tenth Amendment, Eleventh Amendment, and Guarantee Clause of the United States constitution.[5]

Brown and Culberson moved to intervene pursuant to Fed. R. Civ. P. 24(a)(1) ("Upon timely application, anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene"), contending that the PLRA granted them an unconditional right to intervene. The district court held that the PLRA's intervention provision applies neither to appellants nor to this case. Finding error as to each of these grounds, we reverse.

A. Including A Legislator

At the time Brown and Culberson initially moved to intervene in May 1996, the PLRA, 18 U.S.C. § 3626(a)(3)(F), granted a right to intervene to:

---

[5] Brown and Culberson wish to argue, *inter alia*, "that perpetual federal jurisdiction over the Texas prison system: (1) invades the core of sovereign authority reserved to the States by the structure of the 'compound republic' of America as expressed by the Tenth Amendment to the U. S. Constitution; (2) violates the Guarantee Clause; (3) violates the Eleventh Amendment; (4) violates principles of federalism and comity; . . . and/or (7) is null and void because the 1992 Ruiz settlement agreement was a void contract from its inception because its key terms and effects were materially misrepresented."

Our holding today in no way reflects a judgment about the merits of these arguments.

6

"[a]ny state or local official or unit of government whose jurisdiction or function includes the appropriation of funds for the construction, operation, or maintenance of prison facilities, or the prosecution or custody of persons who may be released from, or not admitted to, a prison as a result of a prisoner release order . . . ."

In October 1996, while the motion to intervene was still pending before the district court, TDCJ sought to appeal to this Court the district court's failure to promptly rule on TDCJ's referenced motions to terminate, and in February 1996 Brown and Culberson filed with this Court a motion to intervene in that appeal. We denied Brown and Culberson's motion as inappropriate because the district court had not yet ruled on Brown and Culberson's initial motion. *See Ruiz v. Scott*, No. 96-21118 (unpublished) (5th Cir. Aug. 6, 1997) (we also dismissed TDCJ's appeal). However, we then expressed the view that it was "at best doubtful that either Representative Culberson or Senator Brown is that sort of state or local official or unit of government to whom or which section 3626(a)(3)(F) grants a right to intervene." *Id.*[6] Indeed, we made this remark in response to arguments made by TDCJ and plaintiffs, which mirror the arguments appellees urge on the present appeal.[7]

Following our lead, the district court held that Brown and Culberson did not fall within the statute's definition of "state or

---

[6] This language was later withdrawn. *See Ruiz v. Scott*, 96-2118 (5th Cir. Oct. 30, 1997) (order denying rehearing *en banc*).

[7] In the prior appeal, TDCJ and plaintiffs were joined in opposing Brown's and Culberson's attempted appellate intervention by the United States, which has since dropped out of the litigation.

7

local official." *See Ruiz v Scott*, Civil No. H-78-987 (S.D. Tex, Nov. 24, 1997). The district court determined that the qualifying "jurisdiction or function" language of section 3626(a)(3)(F) applies to "state and local official[s]" as well as to "unit[s] of government." The court held that Brown and Culberson do not have the "jurisdiction or function" of appropriating funds. Only a collective body and no individual legislator can have the 'jurisdiction' or 'function' of appropriating funds. Texas law vests authority to appropriate funds with the legislative body as a whole, not with individual legislators. *Id. See also Vernon's Ann. Tex. Const*. Art. 8 § 6 (1998) ("No money shall be drawn from the Treasury but in pursuance of specific appropriations made by law . . . ."). Therefore, the district court held that individual legislators were not state officials of the kind covered by the intervention provision.

Significantly, the district court found the absence of the words "individual legislators" indicative of congressional intent.

> "Of particular salience in this matter is the ease with which the putative intervenors' interpretation could have been expressed, had the drafters clearly intended it. This is not an instance of inadvertent ambiguity, nor is it the case of a complex statute that resists interpretation. Neither the standing provision, nor the definitions section, makes any reference to 'individual legislators.' By doing so, it signaled that mere status as a legislator is unavailable . . . ." *Id.*

Thus, the district court determined that Congress' failure to include language explicitly granting intervention to individual legislators foreclosed the possibility that the provision applied to Brown and Culberson.

8

Two days after entry of the district court's order, Congress amended the PLRA to include the very words the district court had found lacking. *See* Public Law 105-119, 111 Stat. 2470, Sec. 123 (a)(1)(B)(ii)(I), November 26, 1997[8]. The intervention provision now reads, "Any state or local official *including a legislator* or unit of government ..." 18 U.S.C. § 3626(a)(3)(F) (emphasis added).

Based on the new statutory language, Brown and Culberson moved the district court to reconsider their motion to intervene. Despite the clarified language, the district court ruled that the intervention provision still did not encompass Brown and Culberson.[9] *See Ruiz v. Scott*, Civil No. H-78-987 (S.D. Tex. Jan. 28, 1997). The court determined that the "jurisdiction or function" language still requires any legislator seeking to intervene to have the authority to *single-handedly* appropriate funds. The amended language, the court concluded, simply clarified that individual legislators were not excluded *per se*.

We review the district court's interpretation of the PLRA *de novo*. *See Spacek v. Maritime Assn.,* 134 F.3d 283. 288 (5th Cir. 1998).

"In interpreting a statute, our objective is to give effect to the intent of Congress. As always, we begin with the language of the statute itself." *Stiles v. GTE Southwest Incorporated*, 128

---

[8]    The amendment was apparently made in response to this Court's earlier dicta regarding the intervention provision, and not in response to the district court's order.

[9]    Technically, this part of the district court's order is dicta since the court based its holding on the grounds that the intervention provision did not apply in this case, discussed *infra*.

F.3d 904, 907 (5th Cir. 1997) (citation omitted).

We conclude that the statute clearly grants individual legislators the right to intervene. As amended, the intervention provision (section 3626(a)(3)(F)) reads:

> "Any State or local official including a legislator or unit of government whose jurisdiction or function includes the appropriation of funds for the construction, operation, or maintenance of prison facilities, or the prosecution or custody of persons who may be released from, or not admitted to, a prison as a result of a prisoner release order shall have standing to oppose the imposition or continuation in effect of such relief and to seek termination of such relief, and shall have the right to intervene in any proceeding relating to such relief."

It is perfectly clear that "appropriation of funds" requires action of the legislature as a unit or whole. However, it is equally clear that no such "appropriation of funds" can be made without the action of individual legislators and that each legislator, by virtue of that office, has the right, and it is a part of his or her role as a legislator, to participate in the legislature's taking of that action. The question here, then, can be more generally stated as follows: when a particular species of action can be taken only by a multi-member governmental body as a unit or whole, but the body cannot do so if its members do not participate in the taking of the action and the members, as such, have the right, and it is part of their role as members, to so participate, can it fairly be said that a reference to officials or governmental units whose "jurisdiction or function" includes (*inter alia*) the taking of such particular action encompasses only the bodies themselves to the exclusion of their individual members?

10

The answer, it seems to us, will depend on the context in which the reference is made.  Absent any contrary contextual indication, the most natural reading of such a reference is that solely the body itself is intended.  But a slight change in context may point to a broader intended reference which encompasses not only the body itself but also its individual members.  For example, although the decision of cases before the Supreme Court is clearly made only by the Court itself, nevertheless it is perfectly  natural and reasonable to speak of the jurisdiction or function of a Justice of the Supreme Court as including deciding cases that come before the Court.  The context here compels a similar reading as to the "jurisdiction or function" of "a legislator."

The position of "a legislator" is one which in essence exists and has a jurisdiction and function *only* as a member of a legislative body or a given branch thereof, and hence the statutory words "including a legislator" plainly indicate that for purposes of determining what is within the "jurisdiction or function" of "a legislator" it is proper to consider what is included within the jurisdiction or function of the legislature itself.  Moreover, to come within section 3626(a)(3)(F) the putative intervenor must have a "jurisdiction or function" which "includes" *either* "the appropriation of funds" for prisons *or* "the prosecution or custody" of persons who may be released from or not admitted to a prison as a result of the order in question.  However, the jurisdiction or function of a legislator (or the legislature) plainly does *not* include the "prosecution or custody" of criminally accused or

11

convicted persons. Hence, to hold that the jurisdiction or function of "a legislator" also does not include "the appropriation of funds" for prisons (although the jurisdiction or function of the legislature itself plainly does include that) is to render totally without meaning or significance the statutory words "including a legislator." Such a construction is contrary to the canon that "[e]very word used in a statute is presumed to have a meaning, and, if possible, every word must be accorded significance and effect." *Argosy Limited v. Hennigan*, 404 F.2d 14, 20 (5th Cir. 1968). *See also Crist v. Crist*, 632 F.2d 1226, 1233 n.11 (5th Cir. 1980) (courts must "give effect, whenever possible to all parts of a statute and avoid an interpretation which makes a part redundant or superfluous"). This canon has special force as to the words "including a legislator" because they were added to the statute by amendment and we presume "that when Congress amends a law the amendment is made to effect some purpose." *Argosy Limited* at 20.[10]

---

[10]     We note that appellants have also argued that section 3626(a)(3)(F) may be construed so that its "whose jurisdiction or function includes" limiting language applies only to "unit of government" and not to "[a]ny State or local official including a legislator." While such a construction has the virtue of honoring Congress' plain 1997 intent to include "a legislator" among the class of those to whom section 3626(a)(3)(F) grants the right to intervene, it is not necessary for that purpose, as the construction we adopt in the text likewise does so. And, there are at least two reasons for preferring the construction we adopt. To begin with, it is and has always been unambiguously obvious that a legislator is included within the class of persons described *only* by the words "any State or local official," and accordingly such a construction would cause "including a legislator" to be "redundant and superfluous" contrary to *Crist* and is also militated against by the understanding that "'[t]he word "includes" is usually a term of enlargement. . . ." *Argosy Limited* at 20. This rationale is particularly applicable since the words "including a legislator" were added by amendment and we presume "the amendment is made to

Were we not convinced by the statute's plain language, even a cursory glance at the amendment's history would demand this interpretation. The timing of the 1997 amendment, the House Conference Report, and public commentary confirm Congress' unambiguous intent: that the intervention provision applies to individual legislators.

It appears that Congress amended the PLRA largely in response to language in this Court's August 6, 1997, opinion "doubting" that Brown and Culberson satisfied the statutory intervention provision. *See, e.g.,* Kathy Walt, *Judge rejects bid to end U.S. prison control*, THE HOUSTON CHRONICLE, Nov. 25, 1997 ("U.S. House Majority Whip Rep. Tom DeLay, R-Sugar Land, quietly slipped that wording into the bill, primarily as a result of the 5th Circuit ruling and at Culberson's and Brown's behest"). The amendment's sponsor issued a press release calling that congressional intent to this Court's attention: "I wanted . . . the judges on the Fifth Circuit to know, despite their misinterpretation of Congress' original intent, legislators were meant to have the right to intervene in prison lawsuits, and now that right is explicit. . .

---

effect some purpose." *Argosy Limited*. Here, the obvious purpose was to clarify what was previously doubtful, namely whether it was proper to ascribe for purposes of section 3626(a)(3)(F) a "jurisdiction or function" of a particular multi-member unit of government—the legislature—to its constituent members, the individual legislators. In the second place, a construction that divorces the "whose jurisdiction or function includes" limitation from the "any State or local official" category leads to the absurd conclusion that Congress intended to grant the right to intervene to *any* local official whatever, for example a public weigher, regardless of the total lack of any possible potential effect on that official's duties or function of any order respecting a prison or prisons.

13

.  The amendments I sponsored  . . . [make] it absolutely clear that Judge Justice must immediately end his unjustifiable blockade of the lawsuit filed in May, 1996 by . . . Buster Brown and . . . John Culberson." *Presidential Signature Should End William Wayne Justice's "Reign of Error*," Press Release from the office of Congressman Tom DeLay, November 20, 1997.

The press widely reported that Congress amended the PLRA in response to this Court's expression of doubt that the provision applied to individual legislators. *See, e.g.,* Kathy Walt, *supra; DeLay Amendment Limits Prison Consent Decrees, The Bulletin's Frontrunner*, November 25, 1997 (no author); Michelle Mittelstadt, *Seeking to terminate a federal judge's . . .* ,11/20/97 Associated Press Pol Serv., 1997 WL 2563977 ("DeLay's actions are intended to help two Republican state lawmakers who sought unsuccessfully to intervene in the lawsuit.").

Finally, the House Conference Report explicitly states Congress' intent to grant the right to intervene to individual legislators. *See* H.R. Conf. Rep. 105-405 No. 405, 105th Cong., 1st Sess. 1997, 1997 WL 712946 (Leg. Hist.) (characterizing amendments as "technical and limited [changes] . . .to make clear that 'state or local official' includes individual state legislators . . with regard to who is entitled to intervene as a right . . . .").[11]

---

[11]    The Report states:  "The changes include replacing the word 'permits' with 'requires' to make clear that 'state or local official' includes individual state legislators . . . ." *See id.* The words "permits" and "requires" refer to section 3626(a)(1)(B)(i), which was also amended by the same 1997 legislation.  Pub.L. 105-119, § 123(a)(1)(A), 111 Stat. 2470.  The referenced amendment to section 3626(a)(3)(F) appears in Pub. L. 105-119, § 123(a)(1)(B)(ii)(I), 111

Beyond doubt, the November 1997 amendment to the PLRA grants an unconditional right to intervene to individual legislators.

We recognize that granting individual legislators the right to intervene raises constitutional questions—questions which we subsequently address on the merits in part II of this opinion—and that "[a] court must not interpret a statute in a way that raises constitutional questions if a reasonable alternative construction poses no such problems." *In re Clay*, 35 F.3d 190, 196 (5th Cir. 1994). "But statutory construction may not be pressed '"to the point of disingenuous evasion"' [citations], and in avoiding constitutional questions the Court may not embrace a construction that 'is plainly contrary to the intent of Congress.' [citation]." *Communications Workers of America v. Beck*, 108 S.Ct. 2641, 2657 (1988). Here we conclude that the intent of Congress is plain that individual state legislators are among those to whom section 3626(a)(3)(F) grants the right to intervene where the legislative jurisdiction or function includes appropriation of funds for the construction, operation, or maintenance of prison facilities subject to the challenged prisoner release order, the termination of which the putative intervenors also seek. Here, it is evident to us that the contrary conclusion would amount to disingenuous evasion.

B. Prisoner Release Order

---

Stat. 2470. Section 3626(a)(3)(F) was also then amended in one other respect, namely to correct an obvious wording error by substituting "prison" for "program" so that what had been "program facilities" now reads "prison facilities"; Pub.L. 105-119, § 123(a)(1)(B)(ii)(II), 111 Stat., 2470.

Next, we must determine whether this case falls within the class of cases to which the intervention provision applies. Again, our review is *de novo*. *See Spacek v. Maritime Assn.,* 134 F.3d 283. 288 (5th Cir. 1998).

Section 3626(a)(3)(F) refers to "a prisoner release order" and then states that the described officials or governmental units "shall have standing to oppose the imposition or continuation of such relief, and shall have the right to intervene in *any* proceeding *relating to such relief*." *Id*. (emphasis added). Appellees argue that this provision applies only to cases involving prisoner release orders, and correspondingly, that this case does not involve a prisoner release order. We find that the Final Judgment is indeed a prisoner release order, and therefore that this case falls within the class of cases to which section 3626(a)(3)(F) applies. We do not reach the question whether the intervention provision applies to litigation not involving prisoner release orders.

C. Order vs. Consent Decree

Under the PLRA, "the term 'prisoner release order' includes any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison[.]" Section 3626(g)(4). The district court held that the Final Judgment is not a prisoner release order (PRO). We resolve first whether a consent decree should be considered an "order" under the PLRA and, if so, then

whether the Final Judgment meets the statutory definition of PRO.

We begin by noting that section 3626(g)(4) states that a PLO "*includes any order*" (emphasis added) having a certain purpose or effect or which directs certain things.  Plainly, if the purpose, effect, or direction requirement is met, there is no other restriction on the type of "order"—"any" order is "include[d]."  This indicates an intention that "order" as used in section 3626(g)(4) is to be read in a broad and widely encompassing sense.  We also observe that the Final Judgment constitutes or includes what would normally be considered or described as an order or orders of the court.  The Final Judgment exists and has force and effect only by virtue of the district court's December 1992 "Order Approving Proposed Judgment," which states, *inter alia*, that it is "ORDERED . . . that the proposed final judgment . . . shall be implemented forthwith in all respects."  The Final Judgment itself states that its various subparts contain "a condensed statement of the specific injunctive relief *ordered* henceforth" (emphasis added), and its various provisions repeatedly state that "Defendants *shall*" do this or that or "Defendants *shall* not" do something (emphasis added).  The district court's memorandum opinion approving the Final Judgment notes that it outlines "the continuing relief *ordered*" thereby (emphasis added) and states that approval thereof is proper in part because "this case is at a point at which a comprehensive final *order* is both logical and appropriate" (emphasis added).  In a May 31, 1996, order in this case, the district court characterized the Final Judgment as

17

containing "continuing permanent injunctive *orders*" (emphasis added) and also stated that "the Final Judgment entered permanent injunctions." Indeed, it is plain and not disputed by anyone that the Final Judgment is or contains an injunction or injunctions. *Black's Law Dictionary* (6th ed. 1991) defines injunction as "A court *order* prohibiting someone from doing some specified act or commanding someone . . . ." *Id*. at 784 (emphasis added). In sum, it cannot be doubted that in both ordinary and legal parlance the Final Judgment is or contains an order or orders.

Moreover, it is undisputed that the district court's December 1992 "Order" expressly "approved" the Final Judgment. The PLRA in section 3626(b)(1) expressly uses the term "ordered" to encompass the terms "granted or approved"; and in that sentence "approved" necessarily refers to consent decrees and is there used synonymously with "ordered."[12]

The district court, however, concluded that the Final Judgment was not an "order" within the meaning of section 3626(g)(4) because it was a consent decree, relying on *Local No. 93, Int'l Assoc. of Firefighters, AFL-CIO v. City of Cleveland et al.*, 106 S.Ct. 3063 (1986). We disagree.

The Final Judgment is a consent decree. *Black's Law*

---

[12]     "**(1) Termination of prospective relief. - (A)** In any civil action with respect to prison conditions in which prospective relief is *ordered*, such relief shall be terminable upon the motion of any party or intervenor--
     (i) 2 years after the date the court *granted or approved* the prospective relief . . . ." § 3626(1)(b) (emphasis added).

18

*Dictionary* defines *consent decree* as "[a] judgment entered by consent of the parties . . . ." *Id*. at 284. This definition reveals consent decrees' "hybrid nature" between judgment and contract. *See Firefighters,* 106 S.Ct. at 3073-74. *See also United States v. ITT Continental Baking Co.*, 95 S.Ct. 926, 934 n.10 (1975) ("Consent decrees and orders have attributes both of contracts and of judicial decrees . . . ."), *citing United States v. Swift & Co.*, 52 S.Ct. 460 (1932). "The entry of a consent decree is more than a matter of agreement among litigants. It is a 'judicial act.'" *Lulac v. Clements*, 999 F.2d 831, 845 (5th Cir. 1993), *citing United States v. Swift & Co.*, 52 S.Ct. 460, 462 (1932). Because consent decrees contain elements both of contracts and judicial orders, this Court must decide "whether, given their hybrid nature, consent decrees implicate the concerns embodied in [the PLRA] in such a way as to require treating them as 'orders' within the meaning of that provision." *See Firefighters,* 106 S.Ct. at 3073-74.

The Supreme Court distinguished between judgments and consent decrees for purposes of section 706(g) of Title VII, 42 U.S.C. § 2000e-5(g), in *Firefighters.* There, minority firemen sued the City of Cleveland under Title VII, a union representing city firemen intervened, and subsequently the plaintiffs and the defendant city agreed to a consent decree over the union's objections that the decree provided for special minority promotion opportunities without requiring each beneficiary to demonstrate he had been a victim of discrimination. The union claimed that was contrary to

19

the last sentence of section 706(g).[13]  Before the Supreme Court was the union's appeal of the consent decree judgment on that basis (neither the plaintiffs nor the city challenged the decree).  The Court assumed, *arguendo*, that section 706(g) would have precluded the relief granted by the district court had it been ordered on the basis of a contested case rather than as a consent decree.  The Court held, however, that section 706(g) did not of itself restrict

---

[13]      Section 706(g) of Title VII deals with the relief to be ordered in Title VII lawsuits brought by the EEOC and/or by one or more aggrieved persons.  As it existed at the time of *Firefighters*, section 706(g) consisted of the following single paragraph—the last sentence of which was at issue there—*viz*:

> "(g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.  Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission.  Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.  *No order of the court shall require* the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 704(a)."  Pub.L. 92-261, § 4, 86 Stat. 103, 1972 *U.S. Code Cong. and Adm. News* 122 at 127-128 (emphasis added).

the relief which could be provided for in a consent decree.[14]

We note to begin with that *Firefighters* clearly cannot be read to stand for any categorical or across-the-board proposition that consent decrees must for all purposes, or in respect to all statutory references to court orders or judgments, always be treated differently from judgments or orders entered as the result of contested litigation. To the contrary, that opinion states:

> ". . . as we have previously recognized, consent decrees 'have attributes both of contracts and of judicial decrees,' a dual character that has resulted in different treatment for different purposes. [citation] The question is not whether we can label a consent decree as a 'contract' or a 'judgment,' for we can do both. The question is whether, given their hybrid nature, consent decrees implicate the concerns embodied in § 706(g) in such a way as to require treating them as 'orders' within the meaning of that provision.
>
> Because this Court's cases do not treat consent decrees as judicial decrees in all respects and for all purposes, we think that the language of § 706(g) does not so clearly include consent decrees as to preclude resort to the voluminous legislative history of Title VII. The issue is whether, when Congress used the phrase '[n]o order of the court shall require' in § 706(g), it unmistakably intended to refer to *consent decrees*. . . . We turn therefore to the legislative history, since the language of § 706(g) does not clearly settle the matter."

---

[14] The Court also held that the decree, agreed to by plaintiffs and the defendant city, was not stripped of its status as a consent decree or rendered invalid merely by reason of the intervenor union's not having agreed to it, because "the consent decree entered does not bind . . . [the union] to do or not to do anything," "imposes no legal duties or obligations on the Union at all," and "does not purport to resolve any claims the Union might have under the Fourteenth Amendment, . . . under § 703 of Title VII . . . or as a matter of contract." *Id*. at 3079. "Indeed, despite the efforts of the District Judge to persuade it to do so, the Union failed to raise any substantive claims. Whether it is now too late to raise such claims, or—if not—whether the Union's claims have merit are questions that must be presented in the first instance to the District Court, which has retained jurisdiction to hear such challenges." *Id*.

*Id*. at 3073-74.

In reviewing the legislative history, the Court observed that its holding in *Steelworkers v. Weber*, 99 S.Ct. 2721 (1979), that Title VII did not forbid reasonable private agreements seeking to eradicate race discrimination by affording racial preferences to individuals who had not been victims of discrimination "was largely based upon the legislative history" of Title VII. *Id*. at 3074. In the same vein, "[t]he legislative history pertaining specifically to § 706(g) suggests . . . in fact, that a principal purpose of the last sentence of § 706(g) was to protect managerial prerogatives of employers and unions." *Id*. The Court went on to stress that "[t]here is no indication in the legislative history that the availability of judicial enforcement of an obligation, rather than the creation of the obligation itself, was the focus of congressional concern" and that judicial enforceability of a consent decree by contempt "does not implicate Congress' concern that the federal courts not impose unwanted obligations on employers and unions any more than the decision to institute race-conscious affirmative action in the first place; . . . ." *Id*. at 3076.

The exact opposite is true with respect to the PLRA. The PLRA analog to section 706(g) of Title VII is section 3626(a)(1)(A), which, like section 706(g), sets forth limitations on relief—"[p]rospective relief" in the case of section

22

3626(a)(1)(A)—which a court may afford.[15]  It is clear beyond dispute that in the case of the PLRA—*unlike* section 706(g)—those limitations are expressly made as fully applicable to consent decrees as to judgments entered consequent on adversarial litigation and without agreement.  Thus, section 3626(a)(1)(A) expressly limits not only the "prospective relief" which a court may "grant," but, *unlike* section 706(g), *also* that which it may "approve."[16]  Similarly, "prospective relief" is defined so that it expressly "includes consent decrees."  See section 3626(g)(7) & (9).[17]  If there were any doubt about the matter, it is completely

---

[15]    Section 3626(a)(1)(A) provides in relevant part:

> "**(1) Prospective relief.—(A)** Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs.  *The court shall not grant or approve* any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  (Emphasis added).

[16]    Likewise, the parallel right to terminate prospective relief not meeting the section 3626(a)(1)(A) standard is applicable to relief "*approved* or granted."  Section 3626(b)(2) (emphasis added).

[17]    These sections provide:

> "(7) the term 'prospective relief' means *all* relief other than compensatory monetary damages;
>
> . . . .
>
> (9) the term 'relief' means *all* relief in *any form* that may be granted *or approved* by the court, and *includes consent decrees* but does not include private settlement agreements."  (Emphasis added).

Other relevant definitions in section 3626(g) include the following:

23

removed by section 3626(c)(1) & (2)(A), *viz*:

> **"(1) Consent decrees.**—In any civil action with respect to prison conditions, *the court shall not enter or approve a consent decree unless it complies with the limitations on relief set forth in subsection (a).*
>
> **(2) Private settlement agreements.**—**(A)** Nothing in this section shall preclude parties from entering into a private settlement agreement that does not comply with the limitations on relief set forth in subsection (a), *if the terms of that agreement are not subject to court enforcement other than the reinstatement of the civil proceeding* that the agreement settled." (Emphasis added).

In sum, it is wholly obvious that, unlike section 706(g) of Title VII, the PLRA *does expressly* restrict the prospective relief which may be afforded by a consent decree to the same extent and in the same manner as it restricts the prospective relief which may be afforded by a judgment entered pursuant to adversarial litigation without agreement. Moreover, unlike Title VII, which does not mention consent decrees, the PLRA *does* expressly reflect Congress' concern to limit judicial enforcement of obligations that arise out of the agreement of the parties embodied in a consent decree and specifically reflects the intention to distinguish between private settlement agreements which are subject to court enforcement and those which are not (except by reinstatement of the thereby settled

---

> **"(1)** the term 'consent decree' means *any* relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but *does not include private settlements;*
>
> . . . .
>
> (6) the term 'private settlement agreement' means an agreement entered into among the parties that is *not subject to judicial enforcement other than the reinstatement of the civil proceeding* that the agreement settled;" (Emphasis added).

24

proceedings).  And, contrary to the situation in respect to Title VII and its section 706(g), the legislative history of the PLRA is entirely consistent with and supportive of the intention to thus limit the relief which can be afforded by a consent decree.  As the Fourth Circuit said in *Plyler v. Moore*, 100 F.3d 365, 370 (4th Cir. 1996), *cert. denied*, 117 S.Ct. 2460 (1997), citing the PLRA's legislative history, "Congress's purpose in enacting the PLRA was "to relieve states of the onerous burden of complying with consent decrees that often reach far beyond the dictates of federal law."[18]

To hold that the Final Judgment, because it is a consent decree, is therefore not an "order" and hence cannot be a "prisoner

---

[18]    *See, e.g.,* H.R. Rep. No. 21, 104th Congress 1st Sess. (1995), which notes that the then proposed section 3626:

> ". . . addresses the problem of federal court-imposed prison population caps by limiting the remedies that can be granted or enforced by a court in a prison conditions suit alleging a violation of a federal right.  Courts hearing such suits have often approved and enforced *consent decrees* giving expansive relief to the complaining inmates.  While both state courts and federal courts have in some instances entered these unnecessarily broad consent decrees, it is the *federal courts* that, often with seemingly good intentions, *used these consent decrees to intrude into a state criminal justice system* and seriously undermine the ability of the local justice system to dispense any true justice.
>
> Population caps are a primary cause of 'revolving door justice.'  The statistics alone do not reflect the incalculable losses to local communities caused by criminals confident in their belief that the criminal justice system is powerless to stop them.  In Philadelphia, over 100 persons have been murdered by criminals set free by the prison population cap." *Id*. at 11 (emphasis added).

This also reflects that a consent decree may be a prisoner release order.

release order," not only flies in the face of both the language of the PLRA and the manifest intent of Congress, but likewise wrenches *Firefighters* out of context and stands it on its head.

D. "Prisoner Release" Order

Next, the district court determined that even if the Final Judgment is an order, it does not meet the PLRA's definition of "prisoner release" order. The PLRA states that prisoner release order "includes *any* order, *including a temporary restraining order or preliminary injunctive relief*, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." 18 U.S.C. § 3626(g)(4) (emphasis added).[19] The court reasoned that because the State of Texas is free to build more prisons, the Final Judgment only regulates prison density and not prison population. Therefore, the court held that the Final Judgment was not a prisoner release order under 18 U.S.C. § 3626(g)(4). Again, we disagree.

The Final Judgment contains population caps on the number of prisoners allowed to be housed in specified groups of Texas prison units. ("At the time of this Final Judgment, the maximum system population of existing units, including [named units], and 20 trusty camps, is 51,067 . . . ."). Eleven individual prison units

---

[19]    Section 3626(g)(5) provides:

> "**(5)** the term 'prison' means *any* Federal, State, or local *facility* that incarcerates or detains juveniles or adults accused of, convicted of, sentenced of, or adjudicated delinquent for, violations of criminal law;" (emphasis added).

26

are subject to specific population limits. ("Except as permitted by paragraph XIII.D.2 or Exhibit B, defendants shall not permit the population of the following individual units to exceed: Darrington 1610[;] Ferguson 2100[;] Wynne 2300[;] Beto I 3150[;] Clemens 894[;] Coffield 3150[;] Eastham 2153[;] Ellis I 1995[;] Ramsey II 893[;] Retrieve 809[;] Huntsville 1705."). The Final Judgment mandates reducing these limits if any existing housing portions thereof are ever closed or converted to some other use. ("The maximum population of any unit, and the maximum system population, shall be reduced if any facility, including cellblocks, dormitories, or any portion thereof is, for any reason, closed or converted to any use other than the housing of prisoners."). Clearly these specific population limits and regulations have the "purpose or effect of reducing or limiting the prison population" and in substance "direct the . . . non-admission of prisoners to a prison." *See* 18 U.S.C. § 3626(g)(4). *See also Tyler v. Murphy*, 135 F.3d 594, 596 (8th Cir. 1998) (holding that twenty-person cap on probation detainees in one particular prison was a prisoner release order). The fact that the State of Texas is free to build more prisons does not alter the fact that the Final Judgment "limits" the prison population.

In fact, the provisions of the Final Judgment governing the construction of new facilities closely limit and regulate the population within such facilities as well. ("Defendants shall not permit TDCJ-ID's total prisoner population to exceed the maximum system population established by paragraph XIII.B.1, as adjusted

27

pursuant to paragraph XIII.B.4 and by the addition of the maximum population of facilities added pursuant to the terms of this paragraph XIII.D."); ("Defendants may increase unit and system population by constructing permanent additions to or renovating portions of future units and existing units other than [named units]. No addition or renovation that is not substantially self-contained like trusty camp shall be undertaken if its operation would impair the provision of the services, facilities, and conditions to the prisoners assigned to the unit to which the addition or renovation is added.").

The district court was apparently of the view that an order is not a prisoner release order even though it has the purpose or effect of limiting the number of persons that may be held as prisoners in a then presently existing particular incarceration facility, or even in *all* of the then presently existing incarceration facilities of the jurisdiction in question, so long as more prisoners can be incarcerated *in the future* in facilities constructed or enlarged *after* the effective date of the order and the order does not contain an absolute numerical limit on the number of prisoners that can, in the future, be incarcerated in the jurisdiction *regardless* of the capacity or characteristics of prison facilities which may subsequently be created. In our view, such a construction is entirely unwarranted. To begin with, it is highly unlikely that there has *ever* been a court order limiting the number of prisoners that may be incarcerated *regardless* of the

capacity or characteristics of the relevant prison or prisons,[20] so the district court's construction would as a practical matter render the PLRA's provisions respecting prisoner release orders a meaningless exercise in futility.

Moreover, the effect of the Final Judgment *is* to limit the total number of prisoners incarcerated in the Texas prison system to 51,067, at least unless and until additional incarceration facilities are constructed. Although that limitation may not prove permanent (because the order does not wholly prohibit construction and use of new facilities), the fact that the limitation is not permanent does not mean it is not a limitation. There is nothing in section 3626(g)(4), defining prisoner release orders, which suggests that that term is restricted to orders having the effect of *permanently*--as opposed to temporarily or conditionally—"limiting the prison population." Indeed, the language of section 3626(g)(4) clearly reflects that temporary limits are included, for section 3626(g)(4) specifically embraces "a temporary restraining order or preliminary injunctive relief." The Final Judgment also expressly limits the population of various particular prisons. "[T]he prison population" as used in section 3626(g)(4) is not restricted to the entire prison system of a jurisdiction, but also includes individual prisons, which is reflected by the definition of "prison" as "*any* Federal, State, or local *facility* that incarcerates" (see note 19, *supra*) and by the

---

[20] Nor are we aware of any constitutional provisions or laws or court decisions which might even arguably tend to give rise to the issuance of such an order.

29

fact that section 3626(g)(4) includes orders directing "non-admission of prisoners to *a prison*" (emphasis added), which a population limit on a given prison plainly does. *Tyler v. Murphy*, *supra*.

The Final Judgment is clearly a prisoner release order within the meaning of 18 U.S.C. § 3626(g)(4).

Because we find that the PLRA as amended grants intervention as of right to individual legislators, and the Final Judgment here at issue is a prisoner release order, we hold that the intervention provision of the PLRA, section 3626(a)(3)(F), applies to this case.

E.  Timeliness

Now we examine whether Brown and Culberson's motion to intervene was timely. *See* Fed. R. Civ. P. 24(a) ("*Upon timely application*, anyone shall be permitted to intervene in an action (1) when a statute of the United States confers an unconditional right to intervene . . . .") (emphasis added). Denials of intervention as of right are generally reviewed *de novo*. *See Edwards v. City of Houston*, 78 F.3d 983, 985 (5th Cir. 1996). To the extent that the determination is based on a finding of untimeliness, however, this Court reviews for abuse of discretion. *Id.* at 1000.

In *Sierra Club v. Espy*, 18 F.3d 1202 (5th Cir. 1994), this Court set forth four factors by which to evaluate the timeliness of an intervention motion. They are: (1) the length of time applicants knew or should have known of their interest in the case; (2) prejudice to existing parties caused by applicants' delay; (3)

30

prejudice to applicants if their motion is denied; and (4) any unusual circumstances.  *Id.* at 1205.

Based on these factors, the district court determined that Brown and Culberson's intervention motion was untimely.  However, because the district court held that section 3626(a)(3)(F) did not apply to Brown and Culberson, the court's timeliness determination was based on factors relevant to Rule 24(a)(2).  The district court determined that appellants' alleged interest in this case should have been discovered long ago.  This case began in the 1970s, and other legislators testified at that time.  Moreover, the consent decree was entered in 1992, at which time both appellants were members of the legislature.  However, appellants did not raise any objections to the consent decree until their motion to intervene, three-and-a-half years later.  Furthermore, the district court determined that allowing appellants to intervene now would prejudice the existing parties as it "would amount to a relitigation of the original entry of a delicately-crafted consent decree."  While the district court's analysis arguably may have provided an acceptable framework to deny appellants' motions to intervene under Fed. R. Civ. P 24(a)(2) ("interest intervention") or Fed. R. Civ. P. 24(b) (permissive intervention), it cannot sustain the denial of Rule 24(a)(1) statutory intervention in light of the PLRA.[21]

---

[21]   Because we hold that appellants were entitled to intervene under Rule 24(a)(1), we need not determine whether the district court erred in denying appellants' motion to intervene under Rule 24(a)(2) and Rule 24(b)(2).

The first factor this Court should examine in evaluating the timeliness of an intervention motion is "[t]he length of time during which the would-be intervenor actually knew or reasonably should have known of its interest in the case before it petitioned for leave to intervene . . . ." *Sierra Club* at 1205. The timeliness of Brown and Culberson's motion under section 3626(a)(3)(F) must be determined by reference to the passage of the PLRA on April 26, 1996, and its November 1997 amendment. Brown and Culberson initially moved to intervene in May 1996, less than one month after the PLRA provided any statutory right to intervene; and, within a few days after the November 1997 PLRA amendment which added "including a legislator" to section 3626(a)(3)(F), appellants on the basis thereof moved for reconsideration of the order denying their motion to intervene. Clearly, these motions meet any standard of timeliness approved by this Court. *See, e.g.*, *Edwards v. City of Houston*, 78 F.3d 983 (5th Cir. 1996) (finding thirty-seven and forty-seven-day delays not unreasonable); *Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977).

Second, the "prejudice to existing parties" prong of the *Sierra Club* test measures prejudice caused by the intervenors' delay—not by the intervention itself. *See Sierra Club* at 1205 ("(2) the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as it knew or reasonably should have known of its interest in the case"). As we have already concluded that Brown and Culberson did not delay in seeking

32

intervention under section 3626(a)(3)(F), it is plain that Brown and Culberson did not prejudice the existing parties by delay. Finally, we note that the PLRA's intervention provision explicitly authorizes various officials and units of government to oppose the *continuation* of *preexisting* prospective relief, exactly like that in the present case. To now declare Brown and Culberson's motion untimely precisely because this litigation has persisted for decades would frustrate the very purpose of the intervention grant. Surely, this qualifies as an "unusual circumstance" militating in favor of finding timeliness. *See Sierra Club* at 1205. For these reasons, we hold that Brown and Culberson timely moved to intervene in this case under the PLRA.

Intervention under Rule 24(a)(1) is "absolute and unconditional." *See Brotherhood of Railroad Trainmen v. Baltimore & O. R. Co. et. al.*, 67 S.Ct. 1387, 1393. (1947). Rule 24(a)(1) "statutory intervenors" need not show inadequacy of representation or that their interests may be impaired if not allowed to intervene. *Cf.* Fed. R. Civ. P. 24(a)(2) (absent statutory grant, intervention as of right requires showing of timeliness, interest in the subject matter of the transaction, threat that interest may be impaired if not permitted to intervene, and inadequacy of representation by existing parties). Under Rule 24(a)(1), intervenors need not even prove a "sufficient" interest relating to the subject matter of the controversy, since Congress has already declared that interest sufficient by granting the statutory right to intervene. Indeed, "[o]nce it is clear that [the statute

33

applies], there is no room for the operation of a court's discretion." *See Brotherhood of Railroad Trainmen*, 67 S.Ct. at 1393. Consequently, we hold that Brown and Culberson should have been permitted to intervene under the PLRA.

## II. Constitutionality of the PLRA'S "including a legislator" Intervention Provision

Having determined that 18 U.S.C. § 3626(a)(3)(F) grants Brown and Culberson an unconditional right to intervene in this case, we turn to the final question of whether that statutory provision is constitutional. Appellees argue that granting individual legislators the right to intervene under the PLRA would violate Article III of the Constitution because Article III requires intervenors to have standing, which they argue Brown and Culberson lack.

Article III, § 2 limits federal courts' jurisdiction to "cases" and "controversies." *See* U.S. CONST. art. III, § 2; *See also, e.g., Raines v. Byrd*, 117 S.Ct. 2312, 2317 (1997) ("Under Article III, § 2 of the Constitution, the federal courts have jurisdiction over this dispute . . . only if it is a 'case' or 'controversy.'"). The case-or-controversy requirement "ensures the presence of the 'concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Diamond v. Charles*, 106 S.Ct. 1697, 1703 (1986), *citing Baker v. Carr*, 204, 82 S.Ct. 691, 703 (1962).

Standing is a judicially-developed doctrine designed to ensure an Article III court is presented by parties before it with an

34

actual case or controversy.[22] *See, e.g., Raines*, 117 S.Ct. at 2317 ("One element of the case-or-controversy requirement is that appellees, based on their complaint, must establish that they have standing to sue.") (citation omitted); *Lujan v. Defenders of Wildlife*, 112 S.Ct. 2130, 2136 (1992) ("[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III," *citing Allen v. Wright*, 104 S.Ct. 3315, 3324 (1984)).

To establish standing, a party must allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 104 S.Ct. 3315, 3324 (1984). That injury must be "'distinct and palpable' . . . and not 'abstract' or 'conjectural' or 'hypothetical. . . .'" *Id.* (internal citations omitted). This injury requirement ensures that courts will decide only actual disputes and not abstract policy questions more properly decided by coordinate branches of government. *See, e.g., Allen v. Wright*, 104 S.Ct. 3315, 3325 (1984) ("[T]he law of Art. III standing is built on a single basic idea – the idea of separation of powers.")

_____

[22] The standing doctrine has two components, the first imposing constitutional limitations on federal courts' jurisdiction, *discussed infra*, and the second imposing prudential limitations on the exercise of that jurisdiction. *See, e.g., Warth v. Seldin*, 95 S.Ct. 2197, 2210 (1975). Prudential standing limitations help courts identify proper questions for judicial adjudication, and further define the judiciary's role in the separation of powers. *See id.* However, where, as here, Congress has authorized a party's intervention into a case, prudential standing considerations are significantly lessened. *Cf. Raines v. Byrd*, 117 S.Ct. 2312, 2318 n.3 (1997) (noting that Congress' authorization of plaintiffs to challenge law's constitutionality eliminated prudential standing considerations and lessened risk of conflict with legislative branch).

(internal citations omitted).  *See also id.,* ("[Questions relevant to] the standing inquiry must be answered by reference to the Art. III notion that federal courts may exercise power only 'in the last resort, and as a necessity, . . . and only when . . . [i]t is 'consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process . . . .'") (internal citations omitted).  Moreover, "standing also reflects a due regard for the autonomy of those likely to be affected by a judicial decision."  *Diamond* at 1703.  Additionally, standing requires courts to base decisions on a concrete, actual set of facts, so that a court may appropriately limit the precedential value of its decisions.  *See Valley Forge Christian College v. Americans United for the Separation of Church and State,* 102 S.Ct. 752, 759 (1982).

It is doubtful that, if Brown and Culberson were the only parties before the court seeking termination of (or other relief respecting) the Final Judgment, they would have sufficient standing so that the district court would be presented with an Article III case or controversy.  *See Raines v. Byrd*, 117 S.Ct. 2312 (1997) (discussing legislative standing).[23]  We assume, *arguendo only*, that

---

[23]     In *Raines v. Byrd*, 117 S.Ct. 2312 (1997), the Supreme Court held that individual Members of Congress lacked standing to challenge the constitutionality of the line-item veto. *Raines*, 117 S.Ct. at 2314.  In *Raines*, Members of Congress alleged that the line-item veto diminished their congressional voting power, and therefore caused an "injury" sufficient to create standing. *See id.* at 2315-20.  The Court characterized this as an "institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally." *See id.* at 2318.  The Court found that the Members had "alleged no injury to themselves as individuals[, and] the

appellants would not have such standing.  However, we hold that Article III does not require intervenors to independently possess standing where the intervention is into a subsisting and continuing Article III case or controversy and the ultimate relief sought by the intervenors is also being sought by at least one subsisting party with standing to do so.

Traditionally, standing was required only of parties seeking to initiate a lawsuit.  *See  Valley Forge Christian College v. Americans United for Separation of Church & State*, 102 S.Ct. 752, 758 (1982) ("[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to [show standing]").  In recent years, however, some courts have required intervenors to possess standing as well.  *See, e.g., Mausolf v. Babbit*, 85 F.3d 1295, 1300 (8th Cir. 1996)*; United States v. 39.39 Acres of Land*, 754 F.2d 855, 859 (7th Cir. 1985)*; Southern Christian Leadership Conference v. Kelley*, 747 F.2d 777 (D.C. Cir. 1984).  Furthermore, some courts have interpreted language in *Diamond* to suggest that Article III may require intervenors to possess standing as a matter of constitutional law.  *See Diamond,* 106 S.Ct. at 1707 ("We need not decide today whether a party seeking to intervene before a District Court must satisfy not only the requirements of Rule 24(a)(2), but also the requirements of Art. III.").  We think that

---

institutional injury they allege is wholly abstract and widely dispersed . . . ." *See id.* at 2322. Therefore, the Court held that "these individual members of Congress do not have a sufficient 'personal stake' in this dispute and have not alleged a sufficiently concrete injury to have established Article III standing." *Id.*

these courts misinterpret *Diamond*, and further offer little justification for reading this new requirement into Article III.

In *Diamond,* the Supreme Court held that an intervenor could not pursue an appeal in that Court, in the absence of the party on whose side he had intervened, without independently possessing standing. *Id*. at 1700-03. That case involved a challenge to the constitutionality of an Illinois abortion law. Diamond intervened in the district court to defend the statute, claiming an interest as a pediatrician and as a parent of an unemancipated minor daughter.[24] *Id*. at 1701.

After the Court of Appeals struck down the law, Diamond wished to appeal. Unfortunately, the State of Illinois, on whose side Diamond had intervened, and the only party (other than Diamond) on that side of the case, declined to appeal. *Id*. at 1703. The State's failure to appeal the ruling destroyed the presence of a "case" or "controversy" before the Supreme Court. *Id.* at 1704. "By not appealing the judgment below, the State indicated its acceptance of that decision, and its lack of interest in defending its own statute. The State's general interest may be adverse to the interests of appellees, but its failure to invoke our jurisdiction leaves the Court without a "case" or "controversy" between appellees and the State of Illinois." *Id.*

Therefore, in order for Diamond to have appealed the decision, he himself would have needed to satisfy Article III's

---

[24] It is unclear whether Diamond intervened under Rule 24(a)(2) intervention as of right, or under Rule 24(b) permissive intervention.

jurisdictional case-or-controversy requirement. *Id.* at 1706. Diamond could not do this, because his status as a "doctor, a father, and a protector of the unborn" did not create a sufficient interest in the litigation to establish standing. *Id.* at 1705. Diamond lacked standing; since Diamond was the only party pursuing the appeal, the case-or-controversy requirement was unsatisfied. *Id.* at 1708 ("Because [Diamond] lacks any judicially cognizable interest in the Abortion Law, his appeal is dismissed for want of jurisdiction.").

The language in *Diamond* which has created confusion was written in the context of interpreting the applicable intervention rule. In distinguishing Rule 24(a)(2)'s interest requirement[25] from the standing doctrine's interest requirement, the Supreme Court noted the difficulty with which the Courts of Appeals have differentiated the two "interests."

> "This Court has recognized that certain public concerns may constitute an adequate 'interest' within the meaning of Federal Rule of Civil Procedure 24(a)(2) . . . . However, the precise relationship between the interest required to satisfy the Rule and the interest required to confer standing, has led to anomalous decisions in the Courts of Appeals. We need not decide today whether a party seeking to intervene before a District Court must satisfy not only the requirements of Rule 24(a)(2), but also the requirements of Art. III. To continue this suit in the absence of Illinois, Diamond himself must satisfy the requirements of Art. III. The interests Diamond asserted before the District Court in seeking to intervene plainly are insufficient to confer standing on him to continue this suit now." *Diamond* at 1707 (internal citations and footnote omitted).

---

[25]     Fed. R. Civ. P. 24(a)(2) requires an intervenor thereunder to have an "interest relating to the property or transaction which is the subject of the action."

As the *Diamond* Court noted, the Courts of Appeals disagree whether Rule 24(a)(2) requires that a putative intervenor thereunder possess standing. *See Diamond* at 1707, n.21, *citing United States v. 39.39 Acres of Land*, 754 F.2d 855, 859 (7th Cir. 1985); *Southern Christian Leadership Conference v. Kelley*, 747 F.2d 777 (D.C. Cir. 1984); *United States American Tel. & Tel. Co.,* 642 F.2d 1285 (D.C. Cir. 1980); *Sagebush Rebellion, Inc. v. Watt*, 713 F.2d 525 (9th Cir. 1983); *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861 (8th Cir. 1977). Notably, these cases each struggled with defining Rule 24(a)(2)'s interest requirement, and not Article III's jurisdictional requirements. To be sure, the "interest" required by Rule 24(a)(2) has largely evaded a generally accepted precise definition. *See generally*, 7C Wright, Miller, and Kane, *Federal Practice and Procedure: Civil 2d* § 1908 (2d. ed. 1986) at 263 ("There is not as yet any clear definition, either from the Supreme Court or from the lower courts, of the nature of the 'interest relating to the property or transaction which is the subject of the action' that is required for intervention of right."). The *Diamond* Court merely recognized that some courts have equated the Rule's interest requirement with that of standing. *See Diamond* at 1707.

Of the cases cited in *Diamond*, only *Kelly* maintains that Article III (and not just Rule 24(a)(2) & 24(b)(2)) requires intervenors to possess standing. *See Kelly*, 747 F.2d at 778. Unfortunately, the *Kelly* opinion merely assumes that Article III requires intervenors to possess standing, and offers neither

40

precedent nor reasons to support this assertion.

Recently, a divided panel of the Eighth Circuit joined the *Kelly* court in elevating the requirement that intervenors possess standing to a constitutional, rather than a procedural, mandate. *See, e.g., Mausolf v. Babbit*, 85 F.3d 1295, 1300 (8th Cir. 1996). That panel majority held that the presence of intervenors lacking Article III standing destroyed the court's jurisdiction over the case. *See id.* ("In our view, an Article III case or controversy, once joined by intervenors who lack standing, is—put bluntly—no longer an Article III case or controversy"). Judge Wollman disagreed. *Id*. at 1304. The *Mausolf* majority required intervenors to possess standing because intervenors seek to participate in lawsuits and ask courts to decide the merits of their claims. *See Mausolf* at 1300; *accord, City of Cleveland v. Nuclear Regulatory Commission (NRC),* 17 F.3d 1515 (D.C. Cir. 1994), *discussing Kelley*, 747 F.2d 777. Also, some courts have required standing because intervenors stand on "equal footing" with the original litigants in an action. *See NRC* at 1517. *See also People Who Care v. Rockford Board of Education*, 179 F.R.D. 551 (N.D. Ill. 1998) (same); *Solid Waste Agency of Northern Cook County (SWANCC) v. United States Army Corps of Engineers*, 101 F.3d 503, 507 (7th Cir. 1996) ("The threatened injury would give him the minimal standing required by Article III, which our court requires of any intervenor").

We find the better reasoning in those cases which hold that Article III does not require intervenors to possess standing. *See, e.g., Yniguez v. State of Arizona*, 939 F.2d 727, 731 (9th Cir.

41

1991); *Chiles v. Thornburgh*, 865 F.2d 1197 (11th Cir. 1989); *United States Postal Service v. Brennan*, 579 F.2d 188 (2d Cir. 1978). These cases recognize that the Article III standing doctrine serves primarily to guarantee the existence of a "case" or "controversy" appropriate for judicial determination, *see Allen v. Wright*, 104 S.Ct. 3315, 3324 (1984), and hold that Article III does not require each and every party in a case to have such standing. See also, David L. Shapiro, *Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators*, 81 Harv. L. Rev. 721, 726 (1968) ("Perhaps it should go without saying, but it must be understood that there is a difference between the question whether one is a proper plaintiff or defendant in an initial action and the question whether one is entitled to intervene.").

In *Chiles,* the Eleventh Circuit held that standing to initiate a lawsuit was not required in order to intervene into a pending suit. *Id.* at 1213. That court noted that the standing requirement exists to ensure that a justiciable case or controversy exists before the court. *Id.* at 1212. Rule 24, authorizing intervention, presumes that a justiciable case or controversy already exists before the court. *See id; See also,* 7C Wright, Miller, and Kane, *Federal Practice and Procedure: Civil 2d* § 1917 (2d ed. 1986) at 457 ("Intervention presupposes the pendency of an action in a court of competent jurisdiction . . . .") (footnote omitted). Because a court's subject matter jurisdiction is necessarily established before intervention, the *Chiles* Court held that a party seeking to

intervene need not possess standing. *Id.* at 1212-13.[26] *See also* Shapiro, *supra* ("When one seeks to intervene in an ongoing lawsuit, these basic questions [whether the controversy is ripe for adjudication, whether the proper parties are before the court, and whether the interests are sufficient to invoke jurisdiction] have presumably been resolved.").

The Second, Sixth, and Ninth Circuit Courts of Appeals have reached similar conclusions. *See United States Postal Service v. Brennan*, 579 F.2d 188, 190 (2d Cir. 1978) ("The existence of a case or controversy having been established as between the Postal Service and the Brennans, there was no need to impose the standing requirement upon the proposed intervenor."); *Associated Builders & Contractors v. Perry*, 16 F.3d 688, 690 (6th Cir. 1994) ("An intervenor need not have the same standing necessary to initiate a lawsuit in order to intervene in an existing district court suit where the plaintiff has standing", *citing Trbovich v. United Mine Workers*, 92 S.Ct. 630, 635-36 (1972)); *Yniguez v. State of Arizona*, 939 F.2d 727, 731 (9th Cir. 1991) (requiring Article III standing only where intervenor sought to pursue appeal on his own).

---

[26] The Eleventh Circuit held that while Article III does not require intervenors to have standing, "[t]he standing cases . . . are relevant to help define the type of interest that the intervenor must assert [under Rule 24(a)(2)]." *Chiles* at 1213. Like the Supreme Court in *Diamond*, we are not today presented with the proper interpretation of Rule 24(a)(2). Our holding is simply that Article III does not require intervenors to have standing as a matter of constitutional law. Whether intervention under Rule 24(a)(2) requires such a showing, we do not today consider. As to Rule 24(a)(2), see generally *New Orleans Public Service v. United Gas Pipe Line*, 732 F.2d 452, 463-466 (5th Cir. ), *cert. denied*, 105 S.Ct. 434 (1984).

43

Once a valid Article III case-or-controversy is present, the court's jurisdiction vests. The presence of additional parties, although they alone could independently not satisfy Article III's requirements, does not of itself destroy jurisdiction already established.[27] *Cf. Wichita R. & Light Co. v. Public Utilities Commission of the State of Kansas*, 43 S.Ct. 51, 54 (1922) ("Jurisdiction once acquired on that ground [diversity of citizenship] is not divested by a subsequent change in the citizenship of the parties. . . . Much less is such jurisdiction defeated by the intervention, by leave of the court, of a party whose presence is not essential to a decision of the controversy between the original parties.").

Finally, appellees argue that even if standing is not required of all intervenors, it should be required in this case because Brown and Culberson advance arguments not raised by either party—specifically, that the district court's Final Judgment violates the Tenth Amendment, the Eleventh Amendment, and the

---

[27] Somewhat analogously, the presence of additional claims which could not have been filed in federal court does not necessarily divest a federal court of jurisdiction so long as the Article III requirements remain intact. *See* 28 U.S.C. § 1367. When a federal claim is removed to federal court, the addition of a state-law claim, which would not independently be removable, does not deprive a federal court of jurisdiction so long as "the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.'" *See United Mine Workers v. Gibbs*, 86 S.Ct. 1130, 1138 (1966). The *Gibbs* holding is now essentially codified at 28 U.S.C. § 1367, ("the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within [the district court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

44

Guarantee Clause of the United States Constitution. Appellees argue that Brown and Culberson need standing because they "seek to invoke" the district court's jurisdiction in order to decide the merits of their claims. This use of the term "invoke" is misplaced. The court's jurisdiction in this case has already been invoked by the original parties. At the very least, there has been a case or controversy since TDCJ filed its motion to terminate and plaintiffs their opposition, and there continues to be a case or controversy.

Brown and Culberson seek the same ultimate relief as the TDCJ: the termination of the Final Judgment. They merely seek that relief based in part on different legal theories. This is not a case where the intervenors seek alternative injunctive relief, or to block a proposed settlement. Instead, Brown and Culberson seek only to ask the district court to consider other possible legal grounds for granting the relief TDCJ has already requested. Such a request creates no jurisdictional obstacle for the court. *Cf. United States ex Rel Thompson v. Columbia/HCA Health Care Corp.*, 125 F.3d 899 (5th Cir. 1997) (appeals court may uphold judgment on any proper ground, even though ground was not relied upon by the district court). *But see Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 531 (7th Cir. 1988) (suggesting that standing may be required in part because an intervenor acquires rights which may undermine the original parties' interests). Moreover, as the Court said in *Firefighters*:

> "It has never been supposed that one party—whether an
> original party, a party that was joined later, or an

45

intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation.  Thus, *while an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent.*"  *Id*., 106 S.Ct. at 3079 (emphasis added).[28]

---

[28]    The Court went on to note the obvious:

"Of course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement.  A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor."  *Id*.

Whether (or under what circumstances, if any), *if* TDCJ and plaintiffs completely settled, appellants would have sufficient standing for the district court to continue to be presented with an Article III case or controversy is not an issue before us.  Nothing suggests that any settlement is in the offing.  We also note that under the PLRA the district court is precluded, *inter alia*, from entering or approving any consent decree, or otherwise ordering or granting any prospective relief, unless the limitations of section 3626(a) are met.  See section 3626(c).  Nor are we presented with a situation in which the district court has ruled on the motion to terminate, TDCJ does not appeal, and Brown and Culberson attempt to.  *See Diamond*.

In a letter submission tendered approximately a month after this case was orally argued, plaintiffs (not joined by TDCJ) assert for the first time in this Court that if the PLRA authorizes Brown and Culberson to intervene it violates the Tenth Amendment and the Guarantee Clause because, they argue, it constitutes the federal government's selecting who will speak for the state.  But, Brown and Culberson, by their intervention, do not (and they do not purport to) speak for or represent the state or the TDCJ; they speak for and represent only themselves in their respective official positions as individual legislators.  The other arguments in this letter are addressed earlier in this footnote and in the text.  We also note that section 3626(a)(3)(F) speaks only to intervention which seeks, as does that of appellants, "to oppose the imposition or continuation" of court-ordered relief *against* a state (or one of its entities or subdivisions) or "to terminate" such relief; in other words, section 3626(a)(3)(F) intervention is only to *relieve* a state of court orders which impose restrictions or obligations on it.

For the foregoing reasons, we reverse the district court's denial of Brown's and Culberson's motion to intervene and we remand the case with instructions to forthwith grant Brown and Culberson intervention.[29]

REVERSED and REMANDED with instructions

---

[29]    We order that the mandate issue forthwith.  See Fed. R. App. P. 40, 41.  We are informed that the district court has set TDCJ's motion to terminate for hearing January 21, 1999.  We further observe that the motion to terminate has not been promptly ruled on as required by section 3626(e)(1).