Revised February 7, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-41217
_____


JOSE RAUL CASTILLO; FRANCISCO LOPEZ; E ELOY SANCHEZ; JON
ALAN ASHCRAFT; GUSTAVO ALMAGUER

      Plaintiffs - Appellees

   v.

CAMERON COUNTY, TEXAS

      Defendant - Third Party Plaintiff - Appellee

   v.

STATE OF TEXAS; GEORGE W BUSH, Governor of Texas; ALLAN B
POLUNSKY, Member of the Board Texas Department of Criminal
Justice; CAROLE S YOUNG, Member of the Board Texas
Department of Criminal Justice; JOHN DAVID FRANZ, Member of
the Board Texas Department of Criminal Justice; PATRICIA A
DAY, Member of the Board Texas Department of Criminal
Justice; WILLIAM "HANK" MOODY, Member of the Board Texas
Department of Criminal Justice; ALFRED C MORAN, Member of
the Board Texas Department of Criminal Justice; NANCY
PATTON, Member of the Board Texas Department of Criminal
Justice; A M "MAC" STRINGFELLOW, Member of the Board Texas
Department of Criminal Justice; CAROL S VANCE, Member of the
Board Texas Department of Criminal Justice

      Defendants - Third Party Defendants - Appellants


_____

Appeal from the United States District Court
for the Southern District of Texas
_____
January 5, 2001

Before KING, Chief Judge, PARKER, Circuit Judge, and FURGESON, District Judge.[*]

KING, Chief Judge:

Appellants, the State of Texas, et al., appeal from the district court's order continuing injunctive relief in favor of Appellees Jose Raul Castillo, et al. For the following reasons, we VACATE the district court's July 20, 1999 order and REMAND this case to the district court for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

This appeal arises from a 42 U.S.C. § 1983 action brought in 1993 by Plaintiffs-Appellees (the "plaintiffs"), a certified class[1] of detainees in the Cameron County, Texas jail (the "Jail") against Cameron County (the "County") and the State of

---

[*] District Judge of the Western District of Texas, sitting by designation.

[1] The suit was originally filed by Jose Raul Castillo, Francisco Lopez, and Eloy Sanchez. Their motion for class certification for the class consisting of "All prisoners of the Cameron County Jail as of 1/3/94" was granted on January 5, 1994. That class includes both pretrial detainees and convicted inmates. However, we note that if all prisoners as of January 3, 1994 have since left the jail, that would mean there is no class member who is entitled to seek injunctive relief. On remand, the district court should look into the matter of whether, because of this fact, this case is moot, see Davis v. Ball Mem'l Hosp. Ass'n., Inc., 753 F.2d 1410, 1416 (7th Cir. 1985) ("When the claims of all the class members are moot, the action is moot."). See generally CHARLES ALAN WRIGHT ET AL., 13A FEDERAL PRACTICE AND PROCEDURE § 3533.9, at 401 (2d ed. 1984) ("[I]f the claim of the entire class is moot, the case is finished.").

Texas, the governor of Texas, and various members of the Board of the Texas Department of Criminal Justice (the "State").[2] The plaintiffs alleged that overcrowding at the Jail produced conditions that constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the U.S. Constitution.

The plaintiffs originally filed suit against only the County. The County brought a third-party complaint seeking injunctive relief against the State, alleging that the State failed to expeditiously transfer nearly 300 "paper ready" inmates[3] to state correctional facilities and, therefore, was responsible for the constitutional violations. On January 21, 1994, the plaintiffs filed an amended complaint, adding the State as a defendant, and on May 20, 1994, they filed an application for a preliminary injunction, in an attempt to remedy the overcrowding by enjoining the County and the State from incarcerating more prisoners in the Jail than allowed by the Texas Jail Standards.

On August 15, 1994, the district court entered a temporary injunction in favor of the plaintiffs to reduce the jail

---

[2] The State was not brought in to the suit until January 1994.

[3] "Paper ready" inmates are those that are certified for transfer to the institutional division of the Texas Department of Criminal Justice, but who have yet to be transferred.

population (the "August 1994 injunction").[4]  Then, on September

14, 1994, the district court entered a memorandum decision and

order, which included a preliminary injunction against the State

and the County (the "September 1994 injunction").

In its September 1994 injunction, the court made a number of

findings, based on testimony presented at the preliminary

injunction hearing, the documents admitted into evidence, and the

court's tour of the detention facilities.  The court found that

the Jail was overcrowded and that 289 of the detainees were

convicted felons awaiting transfer to state prisons operated by

the Texas Department of Criminal Justice ("TDCJ").  The court

also found that, at that point in time, TDCJ had a scheduled

admissions policy that had caused a backlog of convicted inmates

to accumulate in the Jail.[5]  As a result of this significant

overcrowding, over thirty percent of the detainees slept on

mattresses on the floor each night.  Additionally, fighting

---

[4]     The August 1994 injunction was amended on October 2,
1997, and it is that amended version that is at issue in this
proceeding.

[5]     The Jail, at the time of the issuance of the September
1994 injunction, was designed to hold 546 people.  However, under
jail standards and management practices, counties typically limit
occupancy to 85% of design capacity, which, the court stated, in
this case, would have been 467 detainees, significantly less than
the 862 detainees housed in the Jail at the time.
     We note that an additional facility designed to hold 192
detainees was within weeks of completion at the time of the
hearing on the September 1994 injunction, and, during oral
argument on this appeal, the County announced that construction
had begun on a new facility designed to hold an additional 641
people.

4

requiring medical attention increased. The court also found the medical care received by the inmates to be "alarming" as the County based its medical-care budget on a 500-person average occupancy, rather than the actual occupancy.[6] Furthermore, overcrowding limited the attempts by county officials to classify detainees according to dangerousness and to adequately segregate mentally ill detainees, witnesses, and pretrial detainees.

> The classification that has been possible has lead [sic] to severe overcrowding in some cells. For example, 30 detainees have been forced into a cell designed for 10 and held there three months, where the cell did not have water, a toilet, or a shower. Six detainees have been forced into a holding cell designed for two, leaving at least two of these people with no choice but to stand all day.[7]

---

[6] The court found that, since medicine was unavailable, diabetics were treated with diet, other necessary drugs were also unavailable, and no funds for medical screening for HIV-positive people were allocated. One expert testified that there existed a substantial risk of a tuberculosis epidemic at the time of the hearing.

[7] These findings established to the district court's satisfaction the substantial likelihood that the plaintiffs could prove a constitutional violation. The court also found sufficient evidence to show a substantial likelihood that the plaintiffs could prove the required "deliberate indifference" on the part of the State and the County. The court found that overall, these elements established a substantial likelihood that the plaintiffs would succeed on the merits of their claim.
The court also found that the three other elements necessary to grant a preliminary injunction had been satisfied, namely a substantial threat that the movant will suffer irreparable injury, that the threatened injury outweighs any damage the injunction may cause the opponent, and that the injunction will not disserve the public interest. See United Offshore Co. v. S. Deepwater Pipeline Co., 899 F.2d 405, 407-08 (5th Cir. 1990).

Under the terms of the September 1994 injunction, the State was required to "remove the number of state-ready felons from the custody of Cameron County officials" necessary to bring the Jail's population within design capacity or prove that constitutional conditions would be preserved if the Jail contained more prisoners than it was designed to hold.[8] The September 1994 injunction also required the County to adopt an operation plan describing how the County would provide for the Jail's needs six months in the future and two years in the future, to evaluate and revise those plans on an annual basis, and to submit them to the district court.

On October 2, 1997, the district court amended the August 1994 injunction ("1997 injunction"). The 1997 injunction lists, inter alia, a number of actions intended to reduce the jail population[9] and a number of Population Reduction Provisions that the Cameron County sheriff can make to keep the prison population

---

[8] The court also indicated its willingness to modify the injunction should the State present evidence that the Jail might hold more than its design capacity of detainees under constitutional conditions or should the plaintiffs present evidence that a population cap of design capacity still subjected them to unconstitutional conditions.

[9] For example, the injunction prohibits the Jail from accepting individuals charged with misdemeanors from other nonfederal agencies, unless, for warrantless arrests, the detainee's commitment papers include an order in a specified form finding probable cause or, for warrant arrests, the detainee's commitment papers include a copy of the executed arrest warrant. The injunction also covers treatment of persons accused of felonies from other nonfederal agencies and persons arrested by the sheriff's office.

from surpassing ninety percent of its design capacity. Specifically, the injunction dictates that "if at any time the population of the Cameron County Jail exceeds ninety per cent of the design capacity . . . for such jail, the Sheriff of Cameron County is ORDERED to, and shall, in addition to any other actions he may deem appropriate, take such of the following [Population Reduction Provisions] he may see fit in order to reduce jail population . . . ." For example, one of the Population Reduction Provisions permits the sheriff to "refuse to receive for pre-hearing confinement from state pardon and parole officers any 'blue warrant' person charged with a parole violation."[10] Similarly, "the Sheriff may notify the Department of Pardons and Parole that the 'blue warrant' inmates will be released after they have been held for forty-five days unless a [']white warrant' has issued."[11] Although the 1997 injunction was issued while the State was still a party to the proceedings, it did not require the State to take any particular action, only the County. Pursuant to the 1997 injunction, the Cameron County sheriff

---

[10] A "blue warrant" person "means a person arrested for a parole violation who is to be detained pending administrative process and revocation hearing." Other Population Reduction Provisions include arrangements for alternative housing or for "scheduled reporting," refusal to take from any law enforcement officers any person charged with a non-violent misdemeanor or felony, release of misdemeanor detainees on bond, and release of non-violent pretrial detainees upon application to a judge of a court of competent jurisdiction.

[11] A "white warrant" person means a person detained after revocation of parole.

7

refused to incarcerate a number of "blue warrant" parole violators.[12]

On April 26, 1996, the Prison Litigation Reform Act (the "PLRA"), which "establishes standards for the entry and termination of prospective relief in civil actions challenging prison conditions," went into effect. See Miller v. French, 120 S. Ct. 2246, 2250 (2000); see also Pub. L. No. 104-134, 110 Stat. 1321-66 (1996). On May 3, 1999, pursuant to the PLRA, the State filed a motion to terminate the September 1994 injunction. The State argued that immediate termination of the preliminary injunction was warranted because the PLRA requires termination of prospective relief entered without making certain specific findings, which the district court had not made when it issued the September 1994 injunction. See 18 U.S.C. § 3626(b)(2). Alternatively, the State asserted that the September 1994 injunction must be terminated because the PLRA mandates termination of prospective relief upon the motion of any party or intervener two years after the date the court granted or approved the prospective relief or two years after the enactment date of the PLRA. See id. § 3626(b)(1).

On May 21, 1999, the district court held a status conference. The parties agreed that the September 1994 injunction against the State was no longer necessary, as the

---

[12]     The parties stipulated that by July 27, 1999, there were at least 289 individuals who had outstanding blue warrants.

State had transferred the "paper ready" prisoners to state facilities. Because the State had complied with the September 1994 injunction, the parties also discussed dismissing the State as a party. Moreover, the district court indicated that it was inclined to turn the 1997 temporary injunction against the County into a permanent injunction. The County proposed an order so doing, to which the State objected. Specifically, the State objected to a provision in the order that permitted the Cameron County sheriff to continue to refuse to incarcerate alleged parole violators in order to limit the number of prisoners in the Jail. The State contended that this provision violated the PLRA, which prohibits federal courts from ordering prospective relief that violates state law.

On May 27, 1999, the district court entered an order extending the September 1994 injunction for another sixty days so that the plaintiffs and the County could finalize a consent decree. During those sixty days, on June 28, 1999, the State filed an "advisory," reiterating its objection to continuing the temporary injunctive relief embodied in the 1997 injunction as violative of the PLRA. The State argued, inter alia, that the 1997 injunction constituted a prisoner release order, which, under the PLRA, can only be entered by a three-judge panel that is required to make specific findings, see id. § 3626(a)(3), and that order authorized the Cameron County sheriff to violate state law, action which is also governed by the PLRA. See id.

9

§ 3626(a)(1)(B).

On July 27, 1999, the district court held another status conference ("July 27 hearing") that addressed the September 1994 injunction, the 1997 injunction, and the dismissal of the State as a party to the proceedings. The State argued that the district court should terminate the September 1994 injunction because it did not contain the findings required by the PLRA for the granting of prospective relief, a requirement that was to be applied retroactively. The County agreed that the September 1994 injunction should be terminated, but the plaintiffs argued that the injunction should be continued to prevent the State from again overcrowding the Jail.

In regard to the 1997 injunction, the State objected that it also violated the PLRA, in that the court had not made the proper findings when granting the relief and, also, that it constituted a prisoner release order, which, under the PLRA, may only be issued by a three-judge panel. See 18 U.S.C. § 3626(a)(3)(B). The County and the plaintiffs contended that the 1997 injunction should be continued and that the court had made the requisite findings.

Finally, all three parties agreed that the State should be dismissed as a party. However, the State wanted a proviso that it was still concerned about the sheriff's ability to refuse to incarcerate blue warrant violators.

The district court entered a minute order on July 27, 1999, dismissing the State from the lawsuit. On July 30, 1999, the district court entered an order (the "1999 order") denying the State's motion to terminate and continuing both the September 1994 injunction and "all other preliminary injunctive relief granted by this Court." In making its determination, the court considered all of the arguments made at the July 27 hearing, the stipulation made by all parties that there were at least 289 blue warrants in the County and that the Jail would be well over 100% capacity if those 289 persons were incarcerated, an affidavit filed by Captain Luis Esparza,[13] and the stipulation filed by the County and the plaintiffs on July 29, 1999.[14] Additionally, the district court took judicial notice "of all evidence previously presented in this case."

---

[13] In his affidavit, Esparza, who has been the Captain of the Jail since April 15, 1999, states the following facts: (1)the capacity of the Jail is 738 inmates; (2) as of July 28, 1999 the population of the Jail was 662 inmates, which included 17 blue warrants and 8 white warrants; (3) the 662 inmates includes 515 state inmates and 147 federal inmates; (4) the [October 1997 injunction] has been necessary to keep jail population from overcrowding; and (5) the Jail has been at or about 90% of capacity for the past couple of years and that "[w]ithout the ability to refuse new non violent [sic] inmates when we are approaching or at 90% of capacity we would exceed capacity within one week and would have over one thousand inmates within one month."

[14] The plaintiffs and the County stipulated to the facts in the affidavit of Luis Esparza. We note that the State did not so stipulate.

11

At the time the district court issued the 1999 order, it also purported to make the findings required by the PLRA to limit the termination of relief otherwise subject to termination. The order provided:

> In making this decision, the Court specifically finds that, without the continuation of the temporary injunction, the Cameron County Jail population would almost immediately exceed 100% and thereby created [sic] Constitutionally prohibited jail conditions. The Court specifically finds that prospective relief, including the continuation of the temporary injunction, remains necessary to correct and prevent a current and ongoing violation of the Class Plaintiffs' Federal Constitutional rights, that the temporary injunction extends no further than necessary to correct the violation of the Class Plaintiffs' Constitutional rights, and that the temporary injunction is narrowly drawn and is the least intrusive means to correct the violation.

The State timely appeals the 1999 order.[15]


## II. STANDARD OF REVIEW

Standing is reviewed under a de novo standard. See Tex. Office of Pub. Util. Counsel v. FCC, 183 F.3d 393, 419 n.34 (5th Cir. 1999) (citing 5 U.S.C. § 706). Although the district court's decision to continue the injunctions is to be reviewed for an abuse of discretion, see Alcatel USA, Inc. v. DGI Techs., Inc., 166 F.3d 772, 790 (5th Cir. 1999), because the district court's decision to terminate or continue the injunctions turns on the application of § 3626(b) of the PLRA, that interpretation

---

[15] The County does not appeal the 1999 order.

is reviewed de novo.  See Woodfield v. Bowman, 193 F.3d 354, 358 (5th Cir. 1999).

The application of the relevant sections of the PLRA requires the district court to make a finding of an ongoing constitutional violation, which is a mixed question of law and fact.  See Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649, 661 (1st Cir. 1997), cert. denied, 524 U.S. 951 (1998).  We review mixed questions of law and fact de novo.  See Cargill, Inc. v. United States, 173 F.3d 323, 333 n.13 (5th Cir. 1999).

## III. STANDING

As a threshold matter, we must determine whether the State has standing to pursue this appeal.  The plaintiffs argue that the State lacks standing to appeal the 1999 order because it is no longer a party to the action and, therefore, is no longer bound by or required to take any action in regard to the injunctions.  Recognizing that, in some cases, a nonparty has standing to appeal an injunction that affects it, the plaintiffs contend that the injunction did not require the State to take any particular action or cause the State to suffer any injury, and, therefore, did not affect the State.  Alternatively, the plaintiffs argue that, even if the State is bound by the injunction, the State has no standing to appeal to set aside the injunctive provisions against the County, a co-party that did not appeal.

13

The State argues that it has standing because the PLRA expressly gives it standing to challenge this type of prospective relief.  Additionally, it contends that, even as a nonparty, it has standing to appeal an injunction that adversely affects it. We agree.

### A. Standing Under the PLRA

The PLRA expressly provides for standing for certain officials and units of government.  As § 3626 (a)(3)(F) of the PLRA provides:

> Any State or local official including a legislator or unit of government whose jurisdiction or function includes the appropriation of funds for the construction, operation, or maintenance of prison facilities, or the prosecution or custody of persons who may be released from, or not admitted to, a prison as a result of a prisoner release order shall have standing to oppose the imposition or continuation in effect of such relief and to seek termination of such relief, and shall have the right to intervene in any proceeding relating to such relief.

18 U.S.C. § 3626(a)(3)(F) (2000) (emphasis added).  The PLRA then defines a "prisoner release order" to "include[] any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison."  Id. § 3626(g)(4). Therefore, if the 1999 order (which, as noted above, expressly continues the September 1994 injunction and "all other temporary injunctive relief currently in effect") fits within the

14

definition of a prisoner release order, the statute gives the State both standing and the right to seek its termination or oppose its continuation.

The first question we must answer, then, is whether the injunctions contained or continued in the 1999 order are prisoner release orders. We find that they are. The September 1994 injunction requires the State to "adopt and implement the policies necessary to remove the number of state-ready felons from the custody of Cameron County officials that is necessary to ensure that Cameron County's detention facilities are not populated above design capacity." Similarly, the October 1997 injunction orders the Sheriff of Cameron County, "if at any time the population of Cameron County Jail exceeds ninety per cent of the design capacity," to "take such of the following actions he may see fit in order to reduce jail population." Both of these injunctions cap the prison population at a particular number of detainees, which has the "purpose or effect of reducing or limiting the prison population."

These types of "population caps" have consistently been found to meet the definition of a prisoner release order. See Ruiz v. Estelle, 161 F.3d 814, 825-27 (5th Cir. 1998) (finding final judgment that set specific population limits on number of prisoners allowed to be housed in various prisons to be a prisoner release order), cert. denied, 526 U.S. 1158 (1999); see also Tyler v. Murphy, 135 F.3d 594, 596 (8th Cir. 1998) (holding

15

that twenty-person cap on probation detainees in a particular prison was a prisoner release order).  In fact, a review of the legislative history of the PLRA reveals that it was precisely these types of caps that the statute was created to address. See 141 CONG. REC. S14413-14414 (daily ed. Sept. 27, 1995) (statement of Sen. Dole)("Perhaps the most pernicious form of judicial micromanagement is the so-called prison population cap.").

The September 1994 injunction requires the State to adopt policies that will keep the population of the Jail at design capacity.  The October 1997 injunction requires the sheriff to keep the prison at or below ninety-percent capacity.  We therefore find that these injunctions are prisoner release orders as defined by the PLRA, and therefore, under the PLRA, the State has the right "to oppose the imposition or continuation in effect of such relief and to seek termination of such relief."  18 U.S.C. § 3626(a)(3)(F).


## B. Nonparty Standing to Appeal

In addition to this express statutory grant of standing, we also find that the State possesses sufficient interest in the litigation to qualify for nonparty standing to appeal.  The plaintiffs argue that the State, as a nonparty, lacks standing to appeal the 1999 order because the State is no longer a party to the lawsuit and because the State was not bound or otherwise

16

injured by the injunctions continued in the 1999 order.  The State contends that, even as a nonparty, it has standing to appeal the order because it adversely affects its interests.  We agree.

Plaintiffs correctly assert the general rule that nonparties cannot appeal the court's judgment.  See Marino v. Ortiz, 484 U.S. 301, 304 (1988) ("The rule that only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment, is well-settled.").  However, that rule has not been rigidly adhered to; a nonparty may be allowed to appeal if the decree affects his interests.  As we stated in United States v. Chagra:

> "[I]f the decree affects [a third party's] interests,
> he is often allowed to appeal." . . . Thus, a non-party
> may appeal orders for discovery if he has no other
> effective means of obtaining review.  Similarly non-
> parties have been allowed to appeal orders granting or
> denying further disclosure of documents already in the
> possession of a court or grand jury.  Non-party
> creditors who assert rights in receivership proceedings
> may appeal orders affecting their legitimate interests.
> If an injunction extends to non-parties, they may
> appeal from it.

701 F.2d 354, 358-59 (5th Cir. 1983) (alterations in original) (footnotes and citation omitted); see also United States v. Kirschenbaum, 156 F.3d 784, 794 (7th Cir. 1998) ("[N]on-parties who are bound by a court's equitable decrees have a right to move to have the order dissolved, . . . and other circuits have held that where a non-party is purportedly bound by an injunction, the non-party may bring an appeal rather than face the possibility of

17

a contempt proceeding."); <u>In re Estate of Ferdinand Marcos Human</u>

<u>Rights Litig.</u>, 94 F.3d 539, 544 (9th Cir. 1996) (finding standing

for nonparty where injunction confronted nonparty "with the

choice of either conforming its conduct to the dictates of the

injunction or ignoring the injunction and risking contempt

proceedings"); <u>In re Piper Funds, Inc., Institutional Gov't</u>

<u>Income Portfolio Litig.</u>, 71 F.3d 298, 301 (8th Cir. 1995) ("A

nonparty normally has standing to appeal when it is adversely

affected by an injunction."). However, allowing nonparties to

appeal a court's judgment is still a rare exception to the

general rule.

In order to determine if a nonparty may properly appeal,

this court has adopted a three-part test,[16] analyzing "whether

_____

[16] This test addresses the prudential concerns relevant to a standing analysis, as opposed to the constitutional considerations of Article III. <u>See</u> <u>United States v. McVeigh</u>, 106 F.3d 325, 334 n.7 (10th Cir. 1997) ("Article III authority is a prerequisite to judicial review, however sought. In contrast, a prudential concern, such as nonparty status, counseling uniquely or primarily against the propriety of appeal, need not bar a petition for mandamus review."). It is unclear if the plaintiffs have argued that the State lacks Article III standing; however objections to standing may be raised by an appellate court sua sponte. <u>See</u> <u>Lang v. French</u>, 154 F.3d 217, 222 n.28 (5th Cir. 1998). "To have standing a plaintiff must establish three elements: '[T]he plaintiff must show that it has suffered an injury in fact, the plaintiff must establish causation[, and] there must be redressability.'" <u>Pederson v. La. State Univ.</u>, 213 F.3d 858, 869 (5th Cir. 2000). We find the injury in fact requirement to be satisfied in this instance by the same facts that demonstrate the State has a "personal stake in the outcome," analyzed below. Additionally, we find the causation and redressability requirements to be satisfied because the injunctions precipitated the violations and their termination will end them.

'the non-parties actually participated in the proceedings below, the equities weigh in favor of hearing the appeal, and the non-parties have a personal stake in the outcome.'" Searcy v. Philips Elecs. N. Am. Corp., 117 F.3d 154, 157 (5th Cir. 1997); EEOC v. La. Office of Cmty. Servs., 47 F.3d 1438, 1442-43 (5th Cir. 1995); see also Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd., 205 F.3d 1107, 1113 (9th Cir. 1999) (stating that a nonparty to the litigation on the merits will have standing to appeal the decision when the party participated in the proceedings and the equities favor hearing the appeal); Davis v. Scott, 176 F.3d 805, 807 (4th Cir. 1999); Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 496 (3d Cir. 1998); Binker v. Commonwealth of Pa., 977 F.2d 738, 745 (3d Cir. 1992).

We find that under this standard, the State is permitted to appeal the continuance of the injunctions. First, there can be no question in this instance that the State has been an active participant in the proceedings. From the time the plaintiffs first amended their complaint to just two days before the continuance of the injunctions, the State was a named party to the proceedings. In fact, the State brought the very motion that was denied in the order that is being appealed.

Second, the equities weigh in favor of allowing the State to appeal. Given that the PLRA itself gives the State the right to seek the termination of injunctive relief, it seems unjust to

19

deny them standing to appeal the denial of that termination.[17]

Similarly, as the State filed the original motion to terminate

the injunctions, and maintained that position at the July 30

hearing, we find it unfair to continue the injunctions without

permitting the State to appeal the continuation.  Therefore, we

conclude that the equities of the situation weigh in favor of

allowing the State to appeal.

Under the third prong, the State must show it has a personal

stake in the outcome.[18]  We find that it does.  First, the

State's economic interests are implicated.  Although the State

had been dismissed as a party, prior to the 1999 order continuing

the injunctions, no changes were made to the September 1994

injunction itself, which requires the State to remove paper-ready

prisoners within forty-five days.  In Loyd v. Alabama Department

of Corrections, 176 F.3d 1336, 1341 (11th Cir.), cert. denied,

120 S. Ct. 613 (1999), the Eleventh Circuit held that requiring

---

[17]    This is similar to a result we reached in Searcy.  In
Searcy, the court found that because Congress granted the
government the right to withhold consent to voluntary
settlements, "it would be odd to preclude appellate remedies
based on the government's failure to intervene."  Searcy, 117
F.3d at 157.

[18]    As an example, in Searcy, this court found this prong
satisfied by a settlement stretching to "'all claims and
counterclaims asserted in any pleading or other filing in this
action . . . arising out of the transactions and occurrences that
are the subject matter of this action.'"  Searcy, 117 F.3d at
157.  The court determined that the order could arguably be
interpreted to include the government for claim preclusion
purposes, which gave the government a stake in the outcome.  Id.
at 158.

the state to transfer prisoners from county to state jails within a specified period of time impacts the economic interests of the state because it must have facilities available for the transfer. We agree.  Second, should the State violate the September 1994 injunction it risks being found in civil contempt.  "'A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order.'" Travelhost, Inc. v. Blandford, 68 F.3d 958, 961 (5th Cir. 1995) (citing SEC v. First Fin. Group of Tex., Inc., 659 F.2d 660, 669 (5th Cir. 1981).  As the State was a party to the proceedings when the September 1994 injunction was originally issued, it could reasonably believe itself at risk of civil contempt if it violated the injunction, regardless of whether it has since been dismissed as a party.  Therefore, the State has a sufficient personal stake in the outcome to challenge the continuation of the September 1994 injunction.

   In regard to the October 1997 injunction, even though the State is not required to perform or refrain from performing any particular acts by the its terms, we find the State's sovereign and quasi-sovereign interests to be implicated.  First, the October 1997 injunction allows the sheriff, in violation of state law, to refuse to incarcerate state parole violators for whom blue warrants have been issued.  The State has a sovereign interest in enforcing its laws.  See Alfred L. Snapp & Son, Inc.

21

<u>v. Puerto Rico</u>, 458 U.S. 592, 601-02 (1982) ("Two sovereign interests are easily identified: First, the exercise of sovereign power over individuals and entities within the relevant jurisdiction——this involves the power to create and enforce a legal code, both civil and criminal."); <u>Tex. Office of Pub. Util. Counsel v. FCC</u>, 183 F.3d 393, 449 (5th Cir. 1999) ("[S]tates have a sovereign interest in 'the power to create and enforce a legal code.'") (citing <u>Snapp</u>, 458 U.S. at 601).  Because the State has a sovereign interest in enforcing its laws, it has a personal stake in appealing the October 1997 injunction that gives the County discretion to violate those laws.

Second, all of the parties stipulated that there were 289 blue warrant violators who, but for the injunction, would be required under state law to be housed in the Jail.  This implicates the State's quasi-sovereign interest in protecting its citizens from criminal activity.  <u>See</u> <u>Snapp</u>, 458 U.S. at 602 ("Quasi-sovereign interests stand apart from [sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party] . . . . They consist of a set of interests that the State has in the well-being of its populace.").  While we recognize that the concept of quasi-sovereign standing "risks being too vague to survive the standing requirements of Article III," <u>id.</u> at 602, we find the State's interest at issue here falls within the category of "a quasi-sovereign interest in the health and well-being——both physical

22

and economic—of its residents in general." Id. at 607.  As a result of this injunction, parole violators who should be incarcerated remain free, potentially increasing the level of criminal activity.  The State has a legitimate interest in "protect[ing] its citizens from criminal elements."  Nat'l People's Action v. Village of Wilmette, 914 F.2d 1008, 1011 (7th Cir. 1990) (citing Hynes v. Mayor & Council of Borough of Oradell, 425 U.S. 610, 618 (1976)).  This quasi-sovereign interest also gives the State a personal stake in the outcome of the appeal.

For the reasons stated above, we find the State satisfies the three-part standard set out in Searcy and, therefore, has standing to appeal the 1999 order.

## IV. TERMINATION OF RELIEF UNDER § 3626(b)

The PLRA "establishes standards for the entry and termination of prospective relief in civil actions challenging prison conditions."  Miller v. French, 120 S. Ct. 2246, 2250 (2000).  The PLRA both "narrowly limits the relief a court may order in prisoner suits," Ruiz v. Estelle, 161 F.3d 814, 817 (1998), cert. denied, 526 U.S. 1158 (1999), and "authorizes the termination of existing prospective relief that does not comply with these limits."  Id.

Regarding termination of prospective relief,[19] the PLRA distinguishes between immediately terminable relief and relief that is terminable after a specified period of time has passed. The requirements for the former are set out in § 3626(b)(2):

> In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

Id. § 3626(b)(2). The requirements for the latter are set out in § 3626(b)(1):

> (A) In any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener—
> (i) 2 years after the date the court granted or approved the prospective relief;
> (ii) 1 year after the date the court has entered an order denying termination of prospective relief under this paragraph; or
> (iii) in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, 2 years after such date of enactment.

Id. § 3626(b)(1). However, both of these termination provisions are subject to the limitation of § 3626(b)(3), which provides that

> Prospective relief shall not terminate if the court makes written findings based on the record that

---

[19]    The PLRA defines "prospective relief" as "all relief other than compensatory monetary damages."  18 U.S.C. § 3626(g)(7).  The relief contained in the injunctions is, therefore, considered prospective relief.

> prospective relief remains necessary to correct a
> current and ongoing violation of the Federal right,
> extends no further than necessary to correct the
> violation of the Federal right, and that the
> prospective relief is narrowly drawn and the least
> intrusive means to correct the violation.

18 U.S.C. § 3626(b)(3).

To determine whether the district court erred in its decision to continue the September 1994 injunction and the 1997 injunction, we must first ascertain if the injunctions were terminable under either § 3626(b)(1) or § 3626(b)(2) and, if so, decide whether the requirements to continue the relief mandated by § 3626(b)(3) were met.

### A. The Injunctions Are Terminable Under § 3626(b)(1)

The State contends that both the September 1994 injunction and the 1997 injunction were entered without the findings required by § 3626(b)(2) and that, therefore, it is entitled to immediate termination of the prospective relief. Additionally, it argues that it is entitled to termination under § 3626(b)(1), because more than two years have elapsed since the district court granted the prospective relief. Therefore, the State asserts that the district court erred in refusing to terminate the injunctions because it was required to do so, unless the court made the written findings based on the record required by § 3626(b)(3), which it did not do. Specifically, the State claims that the record does not support the court's finding that

25

the injunctions (1) were necessary to remedy a "current and ongoing" violation of a federal right, (2) were narrowly drawn, and (3) were the least intrusive means necessary to correct the violation of the federal right (the "§ 3626(b)(3) findings"). The plaintiffs assert that not only were the § 3626(b)(2) findings made when the district court granted the September 1994 injunction and the 1997 injunction, but that, even if they were not, the district court, in its 1999 order, made the § 3626(b)(3) findings that allow the court to continue the relief.

We need not determine whether it was necessary for the district court to expressly make the § 3626(b)(2) findings or if the findings may be implied from the court's judgment because we find that both the September 1994 injunction and the 1997 injunction fall squarely within the termination provision of § 3626(b)(1)(iii) as more than two years have passed since the enactment of the PLRA. Even though the injunctions at issue were granted prior to the enactment of the PLRA, the termination provisions of § 3626(b)(1) still apply. When enacting the PLRA, Congress specifically provided that "'[Section 3626] shall apply with respect to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title.'" Martin v. Hadix, 527 U.S. 343, 355 (1999) (alteration in original) (quoting § 802(b)(1), note following 18 U.S.C. § 3626 (1994 ed., Supp. III)). Additionally, the provision itself provides that "in the case of an order

26

issued on or before the date of enactment of the Prison

Litigation Reform Act, [such relief shall be terminable upon the

motion of any party or intervener] 2 years after such date of

enactment."  18 U.S.C. § 3626(b)(1)(iii).  The PLRA was enacted

on April 26, 1996, and the State, at the time a party to the

proceeding, filed its motion for termination on May 3, 1999, more

than three years later.  Therefore, the relief is terminable

unless the findings set out in § 3626(b)(3) are made.


### B. The Record Inadequately Supports the District Court's Need-Narrowness Findings

Section 3626(b)(3) provides that prospective relief will not

terminate if the court "makes written findings based on the

record" that (1) "prospective relief remains necessary to correct

a current and ongoing violation of the Federal right," (2)

"extends no further than necessary to correct the violation of

the Federal right," and (3) "that the prospective relief is

narrowly drawn and the least intrusive means to correct the

violation."  18 U.S.C. § 3626(b)(3).

We first note that a "current and ongoing" violation is one

that "exists at the time the district court conducts the

§ 3626(b)(3) inquiry."  Cason v. Seckinger, 231 F.3d 777, 784

(11th Cir. 2000); see also Hadix v. Johnson, 228 F.3d 662 (6th

Cir. 2000)(stating that "the PLRA directs a district court to

look to current conditions"); Benjamin v. Jacobson, 172 F.3d 144,

27

166 (2d Cir. 1999) ("Evidence presented at a prior time, however, could not show a violation that is 'current and ongoing.'  Hence, the 'record' referred to cannot mean the prior record but must mean a record reflecting conditions at the time termination is sought."); Imprisoned Citizens Union v. Ridge, 169 F.3d 178, 190 (3d Cir. 1999) ("Mere speculation that Defendants might refuse to honor alleged contractual obligations is insufficient to support a finding of 'current and ongoing violations of [a] Federal right.'" (alteration in original)).[20]

---

[20]    Although the Eleventh Circuit in Parrish v. Alabama Department of Corrections, 156 F.3d 1128, 1129 (11th Cir. 1998) questioned whether an interpretation that "because no constitutional violations exist at the jail right now, no 'current and ongoing' violation can exist" was incorrect because "it could blind courts to violations of federal rights that a court might reasonably expect to recur soon if the injunction is dissolved," it too recently concluded that "current and ongoing" means "a presently existing violation, not a potential, or even likely, future violation."  Cason v. Seckinger, 231 F.3d 777, 784 (11th Cir. 2000).  The Eleventh Circuit found determinative, as we do, the legislative history of the enactment.  The phrase "current and ongoing" was originally enacted as "current or ongoing"; it was amended in 1997.  As the conference report explaining the significance of the change states:

> These dual requirements [of a current and an ongoing violation] are necessary to ensure that court orders do not remain in place on the basis of a claim that a current condition that does not violate prisoners' Federal rights nevertheless requires a court decree to address it, because the condition is somehow traceable to a prior policy that did violate Federal rights, or that government officials are "poised" to resume a prior violation of Federal rights.  If an unlawful practice resumes or if a prisoner is in imminent danger of a constitutional violation, the prisoner has prompt and complete remedies through a new action filed in State or Federal court and preliminary injunctive relief.

Therefore, in order to make the required finding of a current and ongoing violation of a Federal right required by § 3626(b)(3) a court must look at the conditions in the jail at the time termination is sought, not at conditions that existed in the past or at conditions that may possibly occur in the future, to determine if there is a violation of a federal right. Additionally, the court must also, based on the record, make the other findings required by § 3626(b)(3). "The court must make new findings about whether the relief currently complies with the need-narrowness-intrusiveness requirements, given the nature of the current violations. It is not enough under § 3626(b)(3) that the orders, when entered, were sufficiently narrow considering the violations that existed at that time." Cason, 231 F.3d at 784-85. This

> requir[es] particularized findings, on a provision-by-provision basis, that each requirement imposed by the consent decrees satisfies the need-narrowness-intrusiveness criteria, given the nature of the current and ongoing violation. It is not enough to simply state in conclusory fashion that the requirements of the consent decrees satisfy those criteria. Particularized findings, analysis, and explanations should be made as to the application of each criteria to each requirement imposed by the consent decrees.

Id. We agree with this analysis.

In its 1999 order continuing relief, the district court found

---

H.R. Conf. Rep. No. 105-405, at § 123 (1997), 1997 WL 712946 (Leg. Hist.), at *301.

29

that prospective relief . . . remains necessary to correct and prevent a current and ongoing violation of the Class Plaintiffs' Federal Constitutional Rights, that the temporary injunction extends no further than necessary to correct the violation of the Class Plaintiffs' Federal Constitutional Rights, and that the temporary injunction is narrowly drawn and is the least intrusive means to correct the violation.

As a basis for these findings, the court

considered the arguments made by all counsel at the hearing on July 27, 1999, the stipulation made by all parties, including the [sic] Daniel Maeso who represents the State of Texas, that there [sic] at least 289 Blue Warrant persons in Cameron County and that the Cameron County Jail would be well over 100% capacity of [sic] these 289 Blue Warrant persons were incarcerated in that jail, the stipulation filed by Cameron County and Plaintiffs on July 29, 1999 and the Affidavit of Captain Luis Esparza. The Court also takes judicial notice of all evidence previously presented in this case.

Although the language in the 1999 order tracks the requirements of § 3626(b)(3), it does not reach the needed level of particularized findings based on the conditions in the jail at the time termination was requested that is required by § 3626(b)(3). Additionally, there is simply not enough evidence in the record to support the requisite findings.

The only evidence in the record relevant to whether a "current and ongoing" violation of a federal right exists, is that there are 289 Blue Warrant persons outstanding who would put the Jail over design capacity if they were arrested. There are two reasons that this is insufficient to support the finding of a "current and ongoing" constitutional violation. First, although overcrowding may give rise to unconstitutional conditions,

30

overcrowding itself is not per se unconstitutional.  See Rhodes v. Chapman, 452 U.S. 337, 347-50 (1981).  Second, this threat of overcrowding was based on a prediction of future activity.  See, e.g., Watson v. Ray, 192 F.3d 1153, 1158 (8th Cir. 1999) ("[A]ppellant could only point to 'the looming threat of potential overcrowding' but did not produce any evidence to support a finding that this threat constitutes a 'current and ongoing violation' under the PLRA.").

Moreover, there was no evidence in the 1999 order or in the record of any analysis or explanation as to the other findings required by 18 U.S.C. § 3626(b)(3).  For example, we would expect the court to consider other alternatives before reaching the conclusion that these injunctions "extend[] no further than necessary to correct the violation of the Federal right," 18 U.S.C. § 3626(b)(3), and are "narrowly drawn and the least intrusive means to correct the violation."  Id.

However, as we note that the record before us contains almost no evidence regarding current conditions in the Jail and that all parties offered to present additional evidence on these issues at the July 27 hearing, we conclude that the best course of action is to remand this case to the district court to hold an evidentiary hearing on whether the relief meets the requirements of § 3626(b)(3).

## V. ENTRY OF PROSPECTIVE RELIEF UNDER § 3626(a)

In addition to arguing that the injunctions should be terminated pursuant to the §§ 3626(b)(1) and (b)(2) termination provisions of the PLRA, the State also argues that the September 1994 injunction, the 1997 injunction, and the 1999 order should be terminated because they violate the requirements of § 3626(a)(3), which sets out the criteria for the entry of prisoner release orders (including the requirement for a three-judge court), and § 3626(a)(1)(B), which sets out the conditions under which a court can enter prospective relief that allows a government official to violate state law.[21]

In regard to the entry of prisoner release orders, the relevant provisions of § 3626(a)(3) provide:

> (A) In any civil action with respect to prison conditions, no court <u>shall enter</u> a prisoner release order unless–
> (i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and
> (ii) the defendant has had a reasonable amount of time to comply with the previous court orders.

---

[21] The plaintiffs contend that because these arguments were not made in the State's initial motion to terminate the September 1994 injunction, consideration of the issues is precluded. We disagree. "No 'bright-line rule' exists for determining whether a matter was raised below." <u>N.Y. Life Ins. Co. v. Brown</u>, 84 F.3d 137, 142 n.14 (5th Cir. 1996). The State made these arguments in its "Advisory to the Court" filed on June 28, 1999, and these issues were debated at the July 27 hearing, without objection by any party. Therefore, we hold that these issues were adequately raised in the district court and we may consider them on appeal.

> (B) In any civil action in Federal court with respect
> to prison conditions, a prisoner release order <u>shall be
> entered</u> only by a three-judge court in accordance with
> section 2284 of title 28, if the requirements of
> subparagraph (E) have been met.

18 U.S.C. § 3626(a)(3)(A), (B) (emphasis added).  As discussed
above, we have already found the September 1994 injunction and
the 1997 injunction to fit within the PLRA's definition of
prisoner release orders.  Therefore, we must determine how this
provision of the PLRA affects the September 1994 injunction, the
1997 injunction, and the 1999 order.

The State also argues that the September 1994 injunction,
the 1997 injunction, and the 1999 order should be terminated
because they permit the sheriff of Cameron County to refuse to
accept parole violators, in violation of § 3626(a)(1)(B).
Section 3626(a)(1)(B) provides:

> The court <u>shall not order</u> any prospective relief that
> requires or permits a government official to exceed his
> or her authority under State or local law or otherwise
> violates State or local law, unless–
> (i) Federal law requires such relief to be ordered in
> violation of State or local law;
> (ii) the relief is necessary to correct the violation
> of a Federal right; and
> (iii) no other relief will correct the violation of a
> federal right.

<u>Id.</u> § 3626(a)(1)(B) (emphasis added).  The parties do not dispute
that permitting the Cameron County sheriff to decline to accept
"blue warrant" parole violators into the jail constitutes a
violation of state law.  Therefore, we must determine how this

33

provision of the PLRA impacts the existing injunctions and the 1999 order.

While we agree that the PLRA was intended to apply to injunctions existing at the time the PLRA was enacted, we do not agree that the PLRA requires termination of pre-PLRA injunctions that did not meet the requirements of §§ 3626(a)(1)(B) and (a)(3).  As discussed above, when enacting the PLRA, Congress specifically provided that "'[Section 3626] shall apply with respect to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title.'"  Martin v. Hadix, 527 U.S. 343, 355 (1999) (alteration in original) (quoting § 802(b)(1), note following 18 U.S.C. § 3626 (1994 ed., Supp. III)).

"'In interpreting a statute, our objective is to give effect to the intent of Congress.  As always, we begin with the language of the statute itself.'"  Ruiz v. Estelle, 161 F.3d 814, 819 (5th Cir. 1998) (quoting Stiles v. GTE Southwest Inc., 128 F.3d 904, 907 (5th Cir. 1997)).  Here, the language of the provisions at issue indicates that they apply only when the court is entering relief.  Section 3626(a)(1)(B) begins: "The court shall not order any prospective relief."  18 U.S.C. § 3626(a)(1)(B).  Similarly, the language in § 3626(a)(3) provides: "No court shall enter a prisoner release order unless. . . ."  Id. (a)(3).  Relying on the language of the statutes, we conclude that they do not apply when relief was entered prior to the enactment of the PLRA.  The

34

Court of Appeals for the Seventh Circuit agrees.  See Berwanger v. Cottey, 178 F.3d 834, 836 (7th Cir. 1999) ("To the extent this request was based on 18 U.S.C. § 3626(a)(3), which establishes special requirements for prisoner release orders, it was unfounded.  The orders in question long predate § 3626 . . . . The district court did not 'enter' any order in violation of the PLRA.").

In sum, although the PLRA applies to injunctions existing at the time of its enactment, §§ 3626 (a)(1)(B) and (a)(3) apply when relief is entered, whether that occurs by entering new relief or by modifying existing relief.  Therefore, the September 1994 injunction and the 1997 injunction cannot be terminated for failure to comply with §§ 3626(a)(1)(B) and (a)(3) because they predated the PLRA and do not constitute the entering of relief.  Similarly, the district court, in entering the 1999 order, did not enter new relief, but simply denied the State's motion to terminate the existing relief.  Although the court did expressly state that it was continuing the relief, that language is a mere truism – it did no more than state what would happen by operation of law once the motion to terminate the relief was denied.  No changes or modifications to the injunctions in place were made.

Additionally, we note that "[i]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another."  BFP v. Resolution Trust Corp., 511 U.S. 531, 537

35

(1994) (brackets, internal quotation marks, and citation omitted). Congress did not explicitly state that failure to comply with these particular provisions is a ground for termination of relief. In contrast, in § 3626(b), Congress did provide that failure comply with other provisions of the PLRA would be grounds for termination of relief. See 18 U.S.C. § 3626(b)(2). In fact, § 3626(b)(2), which provides for immediate termination of relief if particular findings were not made when the prospective relief at issue was entered, contains almost the exact same findings criteria as § 3626(a)(1), which sets out the requirements for the granting of prospective relief. If Congress had intended that injunctions issued before the enactment of the PLRA were to be terminated for failure to comply with the requirements of §§ 3626(a)(1)(B) and (a)(3), it would have so provided. Therefore, we find that the September 1994 injunction, the 1997 injunction, and the 1999 order are not terminable for failure to comply with those sections.

## VI. CONCLUSION

On remand the district court must first determine if a continuing and ongoing constitutional violation exists, and, if so, whether the remaining requirements of § 3626(b)(3) are met. However, we note that any modification of the existing relief that constituted the entry of new relief would need to meet the requirements set out in § 3626(a). Additionally, should the

36

existing relief be terminated for failure to meet the requirements of § 3626(b)(3), the plaintiffs are entitled to seek new prospective relief, but that relief must also meet the standards set forth in § 3626(a). The district court should conduct the required hearing and rule on termination as promptly as possible.

Therefore, we VACATE the 1999 order and REMAND the case for further proceedings consistent with this opinion.